909 P.2d 567

Stanley R. ATCHLEY, Claimant–
Appellant,

v.

BANK OF HAWAI'I and Industrial In-
surance Company, Employer/In-
surance Carrier–Appellees.

No. 17667.

Supreme Court of Hawai'i.

Jan. 12, 1996.

Daniel E. Chur, (Paul D. Schmeding with him on the brief; of Robinson, Ferrara & Chur), Honolulu, for claimant-appellant.

Amy R. Kondo, (Leighton K. Oshima and Edie A. Feldman with her on the brief; of Wong, Oshima & Kondo), Honolulu, for employer/insurance carrier-appellees.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

RAMIL, Justice.

In this workers' compensation matter, claimant-appellant Stanley R. Atchley (Claimant) appeals [1] the decision and order of the Labor and Industrial Relations Appeals Board (Board) terminating Claimant's vocational rehabilitation services and temporary total disability benefits. The Board also found that Claimant was not permanently and totally disabled "either medically or on an odd-lot basis." Because the Board's findings of fact (FOF) are not clearly erroneous and its conclusions of law (COL) are correct, we affirm the Board's decision and order.

---

1. Hawai'i Revised Statutes (HRS) § 386–88 provides for direct appeals to the Supreme Court

## I. BACKGROUND

Claimant, who has extensive background in the banking industry, was employed as an assistant branch manager for Bank of Hawai'i (Employer).

Before his employment with Employer, Claimant received "the equivalent of a bachelor's degree with graduate studies." Claimant graduated from the American Institute of Banking, did his post-graduate work at University of California at Davis and University of Southern California, attended the School of Banking at Pomona College, and studied advanced accounting at Stanford University. Through his employment with Bank of America from 1960 to 1980, he also attended various banking seminars.

After his employment with Bank of America, Claimant served as president and chief executive officer of Sacramento Valley Bank. He later held a similar position at Sunrise Bank of California. Finally, in 1987, Claimant worked for Employer as an assistant branch manager.

On November 28, 1987, while moving a postage stamp machine, Claimant stepped off a ledge and sustained an injury to his lower back. The following week, while moving a palm tree at work, Claimant reinjured his back to the extent that he claimed he was "unable to move." At the time of the industrial accident, Industrial Insurance Company (Carrier) provided workers' compensation insurance to Employer.

As a result of the injury, Thomas N. Walinski, M.D., an orthopedic surgeon, performed two laminectomies on Claimant, the first in September 1988 and the second in April 1989. Claimant returned to work for Employer on a part-time basis between December 1988 and January 1989, and from August 1989 until May 1990.

In May 1990, Claimant relocated to his cabin in Miwuk Village located at the foothills of the Sierra Nevada Mountains. Claimant stated that his reason for moving to California was to receive soft tissue therapy; however, it was never shown that such treatment was unavailable in Hawai'i.

from the decision of the Labor and Industrial Relations Appeals Board.

Claimant began chiropractic treatment with A. Jay Gehl, D.C. After Claimant lived in California for about five months, Employer and Carrier assigned the case to Cooley Associates for vocational rehabilitation. Upon initial assessment, the vocational rehabilitation counselor recommended that Claimant's participation in vocational rehabilitation services be terminated because: (1) Claimant told the counselor that he remained significantly physically impaired; and (2) "[Claimant] [did] not believe that he could be employed on a part-time or full-time basis."

On March 20, 1991, Carrier notified Claimant's attorney that Claimant's temporary total disability benefits would be terminated on April 4, 1991. Carrier stated that such action was being taken because, according to Louis Nelson, M.D., a physician who evaluated Claimant at Employer and Carrier's request, Claimant's condition was considered "permanent and stationary" and he failed to pursue vocational rehabilitation efforts resulting in the closure of his file.

Claimant's medical records were evaluated by another chiropractor, Donald B. Taylor, D.C., who concluded that Claimant's treatment with Dr. Gehl should be given on an "as needed," and not weekly, basis. It was also Dr. Taylor's opinion that Claimant was not totally disabled, and that, although Claimant's return to employment as a bank manager might cause him difficulty, he recommended that Claimant be considered for work where sitting was combined with walking, standing, and other similar activities.

On July 10, 1991, the Department of Labor and Industrial Relations, Disability Compensation Division (DCD or director), determined that Claimant was entitled to ongoing medical care. However, vocational rehabilitation was terminated on March 13, 1991 because of Claimant's lack of interest in pursuing vocational rehabilitation due to his perception that he could not work, and his entitlement to temporary total disability benefits was terminated effective April 4, 1991. Claimant timely appealed to the Board.

On December 17, 1991, James Langworthy, M.D., a physician specializing in occupational medicine, conducted an independent medical examination of Claimant and reviewed Claimant's medical records. In his written report, Dr. Langworthy recommended, as Claimant's main treatment, a weight loss and exercise program with the goal of becoming more physically fit. Moreover, Dr. Langworthy concluded that Claimant was not totally disabled and "could do a very light job such as clerical work and meeting with the public." It was his opinion that Claimant could work four hours a day. Furthermore, Dr. Langworthy concluded that Claimant was medically stable and rateable, and using *AMA Guides to the Evaluation of Permanent Impairment,* 3rd Edition, rated Claimant's impairment as follows: eighteen percent impairment of the whole person, one percent impairment of the right lower extremity, and thirteen percent impairment of the left lower extremity.

Sometime before May 1992, Claimant began residing in Arizona during the winter months, and in California during the summer months. During his stay in Arizona, he informed Employer, upon Employer's attempt to negotiate a return to work for Claimant, that: his doctor said he could not work; he had been declared to be one hundred percent disabled by a team of doctors; he was advised by his doctor not to do vocational therapy; he was still experiencing difficulty with stability and walking due to his back problem and his subsequent broken foot; and he was residing in Lake Havasu because the desert climate was favorable to his arthritic condition. Nevertheless, in order to return to work, Claimant requested a salary of $45,000.00, which was an increase of $10,000.00 from his previous salary, a sixty-month employment contract when there was no indication that he previously held such a contract with Employer, and moving expenses for his return to Hawai'i. Because of the conditions imposed by Claimant, Employer refused to resume Claimant's employment.

Having considered the issues on appeal, the Board affirmed the termination of vocational rehabilitation services and temporary total disability benefits by the DCD. The Board also concluded that Claimant was permanently partially disabled and not permanently totally disabled. This timely appeal followed.

## II. DISCUSSION

### A. Standard of Review

Appellate review of the Board's decision is governed by HRS § 91–14(g)(5) (1993), which provides:

Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) *Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record;* or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

(Emphasis added.)

[A]ppeals taken from findings [of fact] set forth in decisions of the Board are reviewed under the clearly erroneous standard. Thus, the court considers whether such a finding is [c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record[.] The clearly erroneous standard requires this court to sustain the Board's findings unless the court is left with a firm and definite conviction that a mistake has been made.

A conclusion of law ... is not binding on an appellate court and is freely reviewable for its correctness. Thus, this court reviews [conclusions of law] *de novo*, under the right/wrong standard.

*Bumanglag v. Oahu Sugar Co., Ltd.*, 78 Hawai'i 275, 279, 892 P.2d 468, 472 (1995) (citing *Tate v. GTE Hawaiian Tel. Co.*, 77 Hawai'i 100, 102–03, 881 P.2d 1246, 1248–49 (1994) (internal citations, internal quotation marks, and footnote omitted)).

### B. Vocational Rehabilitation [2]

Claimant contends that the Board erred in finding that Claimant "did not wish to pursue vocational rehabilitation" or lacked motivation to participate vocationally, and erred as a matter of law in concluding that vocational rehabilitation services were "properly terminated on March 13, 1991."

We hold that there is reliable, probative, and substantial evidence in the record to support the Board's findings. First, Claimant voluntarily removed himself from the banking and financial community of Honolulu to Miwuk Village, a remote, rural village, without any evidence of the need (medically or otherwise) to take such action. Consequently, Claimant voluntarily quit his part-time work with Employer in May 1990. Moreover, residing in Miwuk Village made it more difficult for Claimant to look for suitable work in the banking and financial industries or other related fields. Indeed, Claimant's move effectively foreclosed any effort "to return [him] to suitable work in the active labor force as quickly as possible in a cost-effective manner." HRS § 386–25(a) (1993), *see supra*, note 2.

Second, Claimant admitted to the vocational rehabilitation counselor during his initial interview that he considered himself "to be fully retired." His decision to move from urban Honolulu to Miwuk Village comports with his statement that he was in fact "fully retired." While workers' compensation benefits are clearly intended to indemnify a worker for a job-related injury, they are not intended to provide an unemployed worker with lost income upon his retirement. *Employee Ben. Committee v. Pascoe*, 504 F.Supp. 958, 959 (D.Haw.1980).

Third, although Claimant indicated his desire to return to work for Employer despite his limitations, we believe that his de-

---

**2.** HRS § 386–25(a) (1993) provides:

The purposes of vocational rehabilitation are to restore an injured worker's earning capacity as nearly as possible to that level which the worker was earning at the time of injury and to return the injured worker to suitable work in the active labor force as quickly as possible in a cost-effective manner.

mands—a $10,000.00 increase in salary, a five-year employment contract, and moving expenses—are unreasonable. These demands provide further evidence that Claimant was not seriously interested or motivated to return to suitable work.

For these reasons, we hold that it was not clearly erroneous for the Board to find that Claimant was not interested or motivated in pursuing vocational rehabilitation.

Furthermore, Drs. Taylor and Langworthy both concluded that Claimant could perform work and would benefit from vocational rehabilitation. Claimant had already demonstrated his ability to work with his existing back condition, as highlighted by his return to part-time work for Employer in September 1989 and continuing through May 1990 when he returned to the mainland. Moreover, Dr. Gehl reported on July 9, 1990, that Claimant improved considerably as the number of complaints by Claimant decreased by 50 percent and lumbar range of motion increased.

The above reasons also demonstrate that there was reliable, probative, and substantial evidence to support the Board's finding that it was medically feasible for Claimant to pursue vocational rehabilitation. Because Claimant lacked motivation and was not interested in pursuing vocational rehabilitation due to his perception that he could not work, we hold, as a matter of law, that the Board was correct in terminating Claimant's vocational rehabilitation services.

## C.  *Temporary Total Disability Benefits*

Because the Board terminated vocational rehabilitation services, it also terminated Claimant's temporary total disability benefits.

Under HRS § 386–31(b) (1993), temporary total disability payments can be terminated in two ways: (1) if the employee is able to resume work, or (2) by order of the director.

Under the first procedure, if the employer is of the opinion that the injured employee is able to resume work, HRS § 386–31(b) requires the employer to notify both the injured employee and director in writing. The employee may then make a request to the director for a hearing.

■ Under the second procedure, HRS § 386–31(b)(1) provides in relevant part:

In any case where the director determines based upon a review of medical records and reports and other relevant documentary evidence that an injured employee's medical condition may be stabilized and the employee is unable to return to the employee's regular job, the director shall issue a preliminary decision regarding the claimant's entitlement and limitation to benefits and rights under Hawai[']i's workers' compensation laws.

This section, which addresses the termination of temporary total disability benefits, was amended in 1985. The Committee on Employment Opportunity and Labor Relations added this provision requiring the director to issue a preliminary decision when it is determined that the "employee's medical condition may be stabilized and [the employee] is unable to return to his or her regular job." Hse. Conf. Comm. Rep. No. 326, in 1985 House Journal, at 1126. In other words, stability from a medical standpoint is a factor in determining when temporary disability is at an end.

The purpose of [this portion of Act 296] is to amend the provisions of Section 386–31(b) relating to temporary total disability benefits in order to eliminate obstacles and disincentives to the prompt reemployment of injured workers. Claimants who are displaced from their regular jobs due to work-related accidents are confronted with numerous practical problems which in too many instances result in extended periods of temporary total disability benefits and open-ended awards.

*Id.*

HRS § 386–31(b)(1) also requires the director to "inform the injured employee ... of ... limitations on vocational rehabilitation benefits which are designed to facilitate the injured employee's early return to suitable gainful employment[.]" Accordingly, HRS § 386–31(b)(2) provides:

In any case in which the rehabilitation unit determines that an injured employee is not a feasible candidate for rehabilitation and that the employee is unable to resume the

employee's regular job, it shall promptly certify the same to the director. Soon thereafter, the director shall conduct a hearing to determine whether the injured employee remains temporarily totally disabled, or whether the employee is permanently partially disabled, or permanently totally disabled.

■ In the present case, the termination of Claimant's temporary total disability benefits was pursuant to an order of the director "based on the director's review of medical records and reports and other relevant documentary evidence" that Claimant's medical condition was stable under HRS § 386–31(b)(1) and that Claimant was "not a feasible candidate for rehabilitation" because he was not motivated, *see supra*, II.B., under HRS § 386–31(b)(2). Thus, the remaining issue is whether the Board erred in finding that Claimant's condition was stable and rateable.

Dr. Nelson, in his February 4, 1991 report, opined that Claimant's condition was stable and rateable. Claimant was also evaluated by Dr. Langworthy on December 17, 1991. In his report of the same date, Dr. Langworthy opined that Claimant was medically stable and rateable. In his opinion, Claimant was not totally disabled. He rated him at eighteen percent permanent partial impairment of the whole person for his back condition, one percent permanent partial impairment of the right lower extremity, and thirteen percent permanent partial disability of the left lower extremity.

Accordingly, we hold that the Board's finding that Claimant was medically stable and rateable was not clearly erroneous. We therefore hold that the Board was correct in concluding, as a matter of law, that temporary total disability benefits were properly terminated under HRS §§ 386–31(b)(1) and (2).

### D.  *Permanent and Total Disability Under the Odd–Lot Doctrine*

■ Finally, Claimant argues that he is permanently totally disabled under the odd-lot doctrine. The Board, however, concluded:

We do not agree with Claimant that he is permanently and totally disabled, either medically or on an odd-lot basis. Drs. Nelson, Taylor, and Langworthy opined that Claimant was not totally disabled and could perform light work. Claimant has demonstrated an ability to work following his second surgery. He did so as an assistant branch manager for four hours a day from September of 1989 to May of 1990. Continued employment on this basis was available with Employer, but Claimant voluntarily chose to stop working in May 1990. Although appropriate medical care was available in Hawai['']i, Claimant took a leave of absence to obtain "soft tissue therapy" in California. A medical report dated July 9, 1990 from Dr. A. Jay Gehl stated that with such treatment, Claimant improved considerably as his subjective complaints lessened by 50 percent and lumbar range of motion increased. Notwithstanding the noted physical improvement, when Claimant met with the vocational counselor on October 26, 1990, Claimant considered himself to be significantly physically impaired, stating that he is unable to be active on a daily basis for more than one hour. By this time, Claimant had relocated to Arizona and continued to receive his regular salary from Employer. Effective November 1990, Claimant was entitled to social security disability benefits, having been determined disabled for social security purposes in May 1990.

For all the foregoing reasons, we conclude that Claimant chose to withdraw his services from the labor market and is not permanently and totally disabled.

Nevertheless, Claimant cites to his own deposition where he stated his perceived inability to work and contends that he is permanently and totally disabled under the "odd-lot" doctrine.

In *Yarnell v. City Roofing, Inc.*, 72 Haw. 272, 274–75, 813 P.2d 1386, 1388 (1991), we stated:

One of the more colorful, but apt, definitions of the odd-lot doctrine comes from Judge Cardozo:

He was an unskilled or common laborer. He coupled his request for employ-

ment with notice that the labor must be light. The applicant imposing such conditions is quickly put aside for more versatile competitors. Business has little patience with the suitor for ease and favor. He is the 'odd-lot' man, the 'non descript in the labor market.' Work, if he gets it, is likely to be casual and intermittent.... Rebuff, if suffered, might reasonably be ascribed to the narrow opportunities which await the sick and the halt.

*Jordan v. Decorative Co.*, 230 N.Y. 522, 525, 130 N.E. 634, 635–36 (1921) (cited in 2 A. Larson, *Workmen's Compensation Law* § 57.51(b), at 10–164.89 (19–20)). Larson's test provides the following general rule on burden of proof for claimants under the odd-lot doctrine:

If the evidence of degree of obvious physical impairment, coupled with other facts such as claimant's mental capacity, education, training, or age, places claimant *prima facie* in the odd-lot category, the burden should be on the employer to show that some kind of suitable work is regularly and continuously available to the claimant.

A. Larson, *supra*, § 57.61(c), at 10–178. The item missing from claimant's list of considerations is any evidence as to specific availability of employment. In other words, there is a presumption that, if claimant suffers physically, and bears the additional characteristics, then he has proved the *prima facie* case. The employer then has the burden to prove the existence of regular suitable employment.

Claimant, in the instant case, cannot successfully establish the prima facie case that he falls within the odd-lot category. Claimant has significant transferable skills within the banking and the financial community which can be utilized to secure sedentary employment, and his situation is dramatically different from the typical odd-lot claimant who is elderly, performs manual labor, has little or no education, limited language skills, and additionally may suffer from some kind of mental disorder or incapacity. *See, Tsuchiyama v. Kahului Trucking and Storage, Inc.*, 2 Haw.App. 659, 638 P.2d 1381 (1982).

Claimant is a highly educated, professional man with marketable skills and an ability to engage in profitable behavior. During an interview with his vocational rehabilitation counselor, Claimant admitted that he had "a large number of contacts within California and Hawai'i in the banking industry"; yet, it was Claimant's own statements concerning his physical capacity that, according to the counselor, "totally precluded him from benefitting from a return to work plan."

While Claimant repeatedly told his counselor of his plans to work "as a financial planner or bank consultant on his own," he never demonstrated any attempt to do so. In fact, Claimant's inaction, such as not being able to meet with the vocational rehabilitation counselor in person, along with his actions, such as terminating his employment with Employer, keeping dual residences in a remote mountain village and in the Arizona desert, and making unreasonable demands on Employer when discussing the possibility of returning to work, clearly demonstrated that Claimant lacked interest in utilizing his highly marketable and transferable skills.

Accordingly, the Board found that Claimant was not permanently and totally disabled, "either medically or on an odd-lot basis." As stated in *Tsuchiyama*, 2 Haw.App. at 661, 638 P.2d at 1383, it is the duty of the Board to make such a finding, and it should not be overturned unless such determination was clearly erroneous in light of the evidence on the whole record. Accordingly, we hold that the Board's finding that Claimant was not permanently and totally disabled under the odd-lot doctrine was not clearly erroneous.

### III. *CONCLUSION*

For the reasons discussed above, we affirm the Board's decision and order terminating Claimant's vocational rehabilitation services and temporary total disability benefits, and holding that Claimant was not permanently and totally disabled.