926 P.2d 1284

**Susean SHIPLEY, Claimant–Appellant,**

**v.**

**ALA MOANA HOTEL and Travelers Insurance Company, Employer, Insurance Carrier–Appellee,**

**and**

**Special Compensation Fund, Appellee.**

**No. 16922.**

Supreme Court of Hawai'i.

Nov. 19, 1996.

---

Wayne D. Parsons, Parsons & Dellera Law Offices, on the briefs, Honolulu, for claimant-appellant.

Molly Jo Campbell, Char Hamilton Campbell & Thom, on the briefs, Honolulu, for employer, insurance carrier–appellee.

Frances E. H. Lum and Susan Barr, Deputy Attorneys General, on the briefs, Honolulu, for Special Compensation Fund, appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

RAMIL, Justice.

In this workers' compensation case, Claimant–Appellant Susean Shipley (Claimant) appeals[1] the decision and order of the Labor and Industrial Relations Appeals Board (LIRAB) denying compensation for attendant care services and ordering reimbursement. On appeal, Claimant contends that: (1) her attendant care services are "constantly necessary" and payable under HRS § 386–23; and (2) the LIRAB abused its discretion in ordering reimbursement. For the reasons discussed below, we affirm the LIRAB's decision and order.

## I. BACKGROUND

Claimant sustained an industrial injury to her lower back on October 31, 1970, while working as a pantry worker for Ala Moana Hotel (Employer).[2] The workers' compensation claim was contested by neither Employer nor its workers' compensation insurance carrier, Travelers Insurance Company (Insurance Carrier) (collectively Employer/Carrier).

Claimant was confined to a wheelchair and was determined to be permanently and totally disabled on November 1, 1970, as a result of her injury and a pre-existing disability. Employer/Carrier were ordered to pay permanent total disability benefits until June 16, 1976, after which the Special Compensation Fund (SCF) was ordered to pay benefits, pursuant to HRS §§ 386–33 and 386–31(a).

Claimant relocated to California in 1972, then to Georgia in 1979. On September 22, 1987, Helen C. Freeman, M.D., Claimant's attending physician at the time, prescribed for Claimant "an attendant 28 hrs. a wk. (4 hrs a day) for housekeeping, aid in bathing, help with stretching exercises, aid with ambulation, help with transfers, etc." Based on this prescription, Employer/Carrier paid for Claimant's attendant care services for almost three years beginning in September 1987.

1. Under Hawai'i Revised Statutes (HRS) § 386–88, decisions of the Labor and Industrial Relations Appeals Board may be appealed directly to the Supreme Court.

2. According to the employer's report of industrial injury dated November 6, 1970: "Upon re-

moving tray with ice cream glasses from hold over icebox the glasses began to slide on tray. In order to avoid breakage, employee tried to juggle tray to keep contents from falling, causing tray to come completely out of the rack. Employee exerted herself and wrenched her back."

Employer/Carrier subsequently sought to terminate payment for attendant care services. By letter dated February 8, 1991, Employer/Carrier advised Claimant that Hawai'i's workers' compensation law did not require payment for attendant care services unless "constantly necessary." However, Employer/Carrier also informed Claimant that, pursuant to HRS § 386–52, they would continue paying for Claimant's attendant care services pending resolution of the issue by the Department of Labor and Industrial Relations, Disability Compensation Division (DCD).[3]

On May 8, 1991, the DCD held a hearing to address, *inter alia*, Claimant's entitlement to compensation for attendant care services. Although Claimant did not attend the hearing, she submitted a written position statement dated April 29, 1991 for the DCD to consider. In a supplemental decision and order dated July 8, 1991, the DCD denied Claimant compensation for attendant care services. Based upon the record, the DCD determined that Claimant did not require the constant care of an attendant under HRS § 386–23. Furthermore, the DCD ordered Claimant to reimburse Employer/Carrier for payments made after February 9, 1991.[4] Following this decision, Claimant appealed to the LIRAB.

Employer/Carrier asked Claimant to submit to medical examinations by their own specialists; however, Claimant refused to cooperate. Employer/Carrier filed a motion to compel examinations with the LIRAB, and the LIRAB ordered Claimant to undergo three examinations at the Renaissance Rehabilitation Center at North Fulton Regional Hospital in Roswell, Georgia, on November 19 and 21, 1991. Claimant was duly examined.

On January 31, 1992, the LIRAB held a hearing on Claimant's case. On February 11, 1993, the LIRAB issued a decision and order affirming in part and reversing in part the DCD's decision. The LIRAB concluded that Claimant was not entitled to compensation for attendant care services and was obligated to reimburse Employer/Carrier for payments made after February 9, 1991.[5] This timely appeal followed.

## II. *STANDARD OF REVIEW*

The standards of review of decisions of the LIRAB are described in HRS § 91–14(g), which provides in relevant part:

> Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> (1) In violation of constitutional or statutory provisions;
>
> . . . .
>
> (4) Affected by other error of law; or
>
> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

HRS § 91–14(g) (1993). Accordingly,

> appeals taken from findings [of fact] set forth in decisions of the Board are reviewed under the clearly erroneous standard. Thus, the court considers whether such a finding is [c]learly erroneous in view of the reliable, probative, and sub-

---

3. Employer/Carrier thereafter continued to pay Claimant $150.00 per month for attendant care services through July 11, 1991.

4. However, the DCD held Employer/Carrier responsible for payments made voluntarily to Claimant through February 8, 1991.

    The DCD also denied Claimant compensation for modifications to her residence. Claimant's request was denied because Employer/Carrier had already paid for modifications to an earlier home.

5. The LIRAB, however, required Employer/Carrier to pay for Claimant's medical care for dermatitis caused by exposure to poison ivy. Claimant was exposed to poison ivy residue by touching the tire rim of her wheelchair while propelling it. Absent the work-related injury to her back, Claimant would not have been confined to a wheelchair and would not have been exposed to poison ivy residue.

stantial evidence on the whole record[.] The clearly erroneous standard requires this court to sustain the Board's findings unless the court is left with a firm and definite conviction that a mistake has been made.

A conclusion of law ... is not binding on an appellate court and is freely reviewable for its correctness. Thus, this court reviews [conclusions of law] *de novo,* under the right/wrong standard.

*Atchley v. Bank of Hawai'i,* 80 Hawai'i 239, 242, 909 P.2d 567, 570 (1996) (quoting *Bumanglag v. Oahu Sugar Co., Ltd.,* 78 Hawai'i 275, 279, 892 P.2d 468, 472 (1995)).

### III.  DISCUSSION

#### A.  "Constantly Necessary"

Claimant first argues that the LIRAB erred in denying compensation for attendant care services because her living circumstances are such that attendant care services are "constantly necessary" and payable under HRS § 386–23.

At the time of Claimant's original injury in 1970, HRS § 386–23 read as follows:

**Services of attendant.** When the director of labor and industrial relations finds that the services of an attendant for the injured employee is *constantly necessary* he may award a sum of not more than $150 a month as the director may deem necessary for the procurement of such service.[6]

HRS § 386–23 (1968) (emphasis and footnote added).

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is obtained primarily from the language contained in the statute itself. *Pacific Int'l Servs. Corp. v. Hurip,* 76 Hawai'i 209,

216, 873 P.2d 88, 95 (1994).  In interpreting a statute, the court must give the words their common meaning, unless there is something in the statute requiring a different interpretation. *Ross v. Stouffer Hotel Co. (Hawai'i) Ltd. Inc.,* 76 Hawai'i 454, 461, 879 P.2d 1037, 1044 (1994).

The term "constantly necessary" is not expressly defined in HRS § 386–23; therefore, we resort to the dictionary definition for guidance.  Black's Law Dictionary defines the word "constantly" as "continuously." *Black's Law Dictionary* 310 (6th ed. 1990).  The word "continuously" is defined as "[u]ninterruptedly;  in unbroken sequence;  without intermission or cessation;  without intervening time;  with continuity or continuation." *Id.* at 322.  The word "necessary"

must be considered in the connection in which it is used, as it is a word susceptible of various meanings.  It may import absolute physical necessity or inevitability, or it may import that which is only convenient, useful, appropriate, suitable, proper, or conductive to the end sought.  It is an adjective expressing degrees, and may express mere convenience or that which is indispensable or an absolute physical necessity.  It may mean something which in the accomplishment of a given object cannot be dispensed with, or it may mean something reasonably useful and proper, and of greater or lesser benefit or convenience, and its force and meaning must be determined with relation to the particular object sought.

*Id.* at 1029.

However, the dictionary definition of "constantly necessary" is only a starting point. We have held that

the plain language rule of statutory construction[ ] does not preclude an examination of sources other than the language of

---

6.  Except for the change in the total monthly award for attendant services, HRS § 386–23 has not been substantially amended since Claimant's original injury in 1970.  The statute has retained the language "constantly necessary." HRS § 386–23 (1993) provides:

   **Services of attendant.** When the director of labor and industrial relations finds that the service of an attendant for the injured employee is *constantly necessary* the director may

award a monthly sum of not more than the product of four times the effective maximum weekly benefit rate prescribed in section 386–31, as the director may deem necessary, for the procurement of such service.  Payment for the services of an attendant shall be the liability of the employer, but shall be subject to the deductible under section 386–100.

(Emphasis added.)

the statute itself even when the language appears clear upon perfunctory review. Were this not the case, a court may be unable to adequately discern the underlying policy which the legislature seeks to promulgate and, thus, would be unable to determine if a literal construction would produce an absurd or unjust result, inconsistent with the policies of the statute. *Bragg v. State Farm Mutual Auto. Ins. Co.,* 81 Hawai'i 302, 306, 916 P.2d 1203, 1207 (1996) (quoting *Sato v. Tawata,* 79 Hawai'i 14, 17, 897 P.2d 941, 944 (1995)). We must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose. *State v. Toyomura,* 80 Hawai'i 8, 19, 904 P.2d 893, 904 (1995).

Workers' compensation laws were enacted as a humanitarian measure for the benefit of employees. *Hun v. Center Properties,* 63 Haw. 273, 276, 626 P.2d 182, 185 (1981). The two goals of workers' compensation laws are to restore the injured employee and to compensate the employee adequately. *Respicio v. Waialua Sugar Co.,* 67 Haw. 16, 18, 675 P.2d 770, 772 (1984). Therefore, we have long held that workers' compensation laws should be liberally construed in order to accomplish the intended beneficial purposes of the statute. *Locations, Inc. v. Hawai'i Dep't of Labor & Indus. Relations,* 79 Hawai'i 208, 210, 900 P.2d 784, 786 (1995); *Puchert v. Agsalud,* 67 Haw. 25, 36, 677 P.2d 449, 457 (1984), *appeal dismissed,* 472 U.S. 1001, 105 S.Ct. 2693, 86 L.Ed.2d 710 (1985); *Evanson v. University of Hawaii,* 52 Haw. 595, 600, 483 P.2d 187, 191 (1971); *In re Ikoma,* 23 Haw. 291, 295–95 (1916).

For these reasons, we refuse to interpret the term "constantly necessary" in HRS § 386–23 as limiting compensability only to individuals who require care twenty-four hours per day. Doing so would preclude compensation for those who are seriously disabled but require somewhat less than twenty-four hour care. Instead, we interpret HRS § 386–23 as allowing compensation for attendant care services so long as claimants can establish their inability to function or perform activities of daily living on a consistent basis. This standard focuses on whether the claimant's daily functioning is severely impaired, rather than on whether the amount of care satisfies a rigid twenty-four hour requirement.

Therefore, the central question in the present case is whether we are left with a firm and definite conviction that the LIRAB erred with respect to whether Claimant is unable to function or perform activities of daily living on a consistent basis.

The record indicates that, on September 22, 1987, Dr. Freeman, Claimant's physician, prescribed an attendant on a part-time basis of four hours per day, for housekeeping, aid in bathing, help with stretching exercises, ambulation assistance, and transfers. The fact that the prescribed attendant care was limited to four hours per day suggests that Claimant could function independently for the remainder of the day.

Brigitta B. Jann, M.D., who took over Dr. Freeman's duties as Claimant's physician, noted in her first report, dated September 17, 1990, that Claimant continued to walk with crutches, generally had bowel and bladder control, and had been actually recovering since 1987. In her subsequent office note dated November 13, 1990, Dr. Jann noted Claimant's "thespian" flare for "histrionic" pain descriptions with emotional highlighting during transfers. In office notes dated February 25, 1991, August 5, 1991, and September 9, 1991, Dr. Jann commented on Claimant's absolute refusal to consider strategies to deal with her home environment. Dr. Jann recommended simple modifications such as re-arranging her kitchen, pre-planning meals, placing a chair in her shower, and using a bedside commode to minimize in-house travel and to ease transfers onto a commode. However, Claimant consistently refused to make adjustments in her household routines. Dr. Jann noted that her discussions with Claimant were "rather futile." For every solution, Claimant found another problem preventing the proposed solution from being implemented.

The reports by the staff at the Renaissance Rehabilitation Center also do not support compensation for Claimant's attendant care services. Burton McDaniel, M.D., con-

ducted a medical examination, therapist Darlene Kelsesky conducted a physical therapy evaluation,[7] and therapist Kathie Rush conducted an occupational therapy/activities of daily living evaluation.

In his medical evaluation report, Dr. McDaniel noted that Claimant was "independent with the use of her wheelchair on all surfaces." He stated that Claimant "could be independent in her current environment if all equipment and household equipment is adapted to her current deficits." Dr. McDaniel concluded: "Based on patient's current deficits, I would not recommend a 24–hour attendant; however, she could significantly benefit from an attendant 4 hours per day in order to assist in activities of daily living requiring increased strength which is currently lacking from deficits of the left shoulder."

In her evaluation report, Ms. Rush noted that Claimant could be independent for most of her needs if her home environment were modified. Installation of bathroom equipment, such as a tub transfer bench, would enable Claimant to bathe herself. With the aid of assistive devices or at a slower speed, Claimant is able to perform grooming, hygiene tasks, and toileting activities independently. Claimant is able to feed herself independently. Claimant can also dress her upper body independently; however, she requires minimal assistance in dressing her lower body because otherwise, due to her paralysis, she must perform this task on her waterbed.[8] In conclusion, Ms. Rush recommended an attendant four to six hours per day, bathroom equipment, and modification of her home environment.

In summary, the evidence in the record indicates that Claimant would need little or no attendant care if she would implement simple modifications to her home environment.[9] Even without modifications, she would only need attendant care for a maximum of four to six hours per day because she is capable of performing most daily tasks with some degree of independence.[10]

Accordingly, we hold that the LIRAB did not err in denying compensation to Claimant. The record supports the LIRAB's implicit finding that Claimant is generally able to function or perform activities of daily living. Therefore, attendant care services are not "constantly necessary," and Claimant is not entitled to compensation.

### B. *Reimbursement*

■ Claimant next argues that the LIRAB abused its discretion by ordering Claimant to reimburse Employer/Carrier for attendant care payments made after February 9, 1991. This argument is also without merit.

HRS § 386–52 provides in relevant part:

### Credit for voluntary payments and supplies in kind.

(a) Any payments made by the employer to the injured employee during the employee's disability or to the employee's dependents which by the terms of this chapter were not payable when made, shall be deducted from the amount payable as compensation subject to the approval of the director; provided that:

(1) The employer notifies the injured employee and the director in writing of any such credit request stating the reasons for such credit and informing the injured employee that the employee has the right to file a written request for a hearing to submit any evidence to dispute such a credit;

. . . .

7. In her evaluation report, Ms. Kelsesky indicated that Claimant's home environment required modification. Although Ms. Kelsesky stated that Claimant needed an attendant, she gave no opinion regarding the amount of time required.

8. Ms. Rush did not express an opinion on the fact that Claimant uses a waterbed. However, in their answering brief, Employer/Carrier point out that dressing on a firmer surface would be an obvious solution.

9. Claimant did not appeal the DCD's denial of compensation for home modifications. Therefore, we do not address whether Employer/Carrier must pay for home modifications.

10. We also note that Claimant drives a modified van adapted to her physical requirements.

(3) If overpayment cannot be credited, the director shall order the claimant to reimburse the employer. Failure to reimburse the employer shall entitle the employer to file for enforcement of such a decision in accordance with section 386–91.

HRS § 386–52 (1993).

Because Claimant's attendant care services were not "constantly necessary" under HRS § 386–23, *see supra* Part II.A, the benefits paid by Employer/Carrier were "not payable when made." By letter dated February 8, 1991, Employer/Carrier informed Claimant that they would continue to provide attendant care services, but only under the HRS § 386–52 credit provision pending a decision by the DCD on the attendant care issue. In the letter, Employer/Carrier expressly stated: "This letter is to notify you of our credit request and to inform you that you have a right to file a written request for a hearing to submit any evidence to dispute such a credit." The letter clearly satisfies the notice requirements of HRS § 386–52 as to payments made after February 9, 1991.[11] Because Employer/Carrier complied with HRS § 386–52, Claimant's contention that the LIRAB abused its discretion in ordering reimbursement is meritless.

## IV. CONCLUSION

For the foregoing reasons, we affirm the LIRAB's decision and order denying Claimant compensation for attendant care services and ordering reimbursement.

---

11. The letter does not satisfy the notice requirements as to payments made before the letter was sent on February 8, 1991. However, Employer/Carrier did not request, and the LIRAB did not award, reimbursement for such payments.