924 P.2d 169

Mark CROMPTON, Claimant–Appellant,

v.

TERN CORPORATION and First Insurance Company of Hawai'i, Ltd., Employer/Insurance Carrier–Appellee, and K.A. Construction Company, Employer–Appellee, Delinquent, and K.A. Construction Company and California Indemnity Insurance Company, Employer/Insurance Carrier–Appellee, and Rib–Roof Industries, Inc., Employer–Appellee, Delinquent, and Special Compensation Fund, Appellee.

No. 19297.

Supreme Court of Hawai'i.

Sept. 10, 1996.

Jeffrey S. Portnoy, Patricia J. McHenry, and Christopher I.L. Parsons of Cades, Schutte, Fleming & Wright, on the briefs, Honolulu, for claimant-appellant Mark Crompton.

Thomas E. Cook, Edquon Lee, and Steven Y. Otaguro of Lyons, Brandt, Cook & Hiramatsu, on the briefs, Honolulu, for Employer/Insurance Carrier–Appellee Tern Corporation and First Insurance Co. of Hawaii, Ltd.

Clyde Umebayashi and Muriel M. Taira of Kessner, Duca, Umebayashi, Bain & Matsunaga, on the briefs, Honolulu, for Employer/Appellee K.A. Construction Co.

Susan Y.M. Chock, on the briefs, for Employer/Insurance Carrier-Appellee K.A. Construction Co. and California Indemnity Ins. Co.

Margery S. Bronster, Attorney General, and Robyn M. Kuwabe, Deputy Attorney General, on the briefs, for Appellee Special Compensation Fund, Department of Labor and Industrial Relations.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

In this factually complex workers' compensation case, claimant-appellant Mark Crompton appeals the decision and order of the Labor and Industrial Relations Appeals Board (LIRAB) granting summary judgment in favor of employer-appellee Tern Corporation (Tern) and its insurance carrier, appellee First Insurance Company of Hawai'i, Ltd. (First Insurance). On appeal, Crompton argues that the LIRAB erred in concluding that:

(1) employer-appellee delinquent Rib–Roof Industries, Inc. (Rib–Roof), a subcontractor of Tern, was Crompton's "statutory employer" under Hawai'i's workers' compensation scheme and was, therefore, secondarily liable to pay Crompton's workers' compensation benefits after employer-appellee delinquent K.A. Construction Company (KAC), Crompton's direct employer, defaulted on payment of Crompton's workers' compensation benefits for lack of insurance; and (2) the settlement and release agreement in a tort action between Crompton and Rib–Roof did not release Tern and First Insurance from liability for Hawai'i workers' compensation benefits. For the following reasons, we affirm.

## I. BACKGROUND

The following facts are undisputed and are culled from the LIRAB's August 31, 1995

decision and order. On June 1, 1990, Tern entered into a "General Contract" with a property owner to erect a warehouse on property located at Campbell Industrial Park. As the general contractor, Tern subcontracted with Rib–Roof to furnish labor, materials, skill, and equipment necessary for the "design, fabrication, delivery, and erection of the [m]etal building." Rib–Roof, in turn, subcontracted with KAC, a California-based company, to construct the warehouse using Rib–Roof's designs and materials. Crompton, a sheetmetal worker, was hired in California by KAC to install water, gas, and sewer lines for the warehouse.

On September 12, 1990, while on the job, Crompton was standing on a ladder approximately fifteen feet off the ground when the screws holding a 142–pound steel beam he was installing came loose, and the beam gave way. The falling beam knocked Crompton off the ladder. He fell to the ground, and the beam fell onto Crompton's shoulder. Crompton sustained serious injuries to his spine and left arm.

At the time of the accident, neither KAC nor Rib–Roof carried Hawai'i workers' compensation insurance. KAC was, however, insured for workers' compensation coverage in California by California Indemnity Insurance Company (CIIC). Tern was insured for workers' compensation coverage in Hawai'i by First Insurance.

On the day of the accident, Crompton filed a claim for workers' compensation benefits with KAC and CIIC in California. CIIC challenged Crompton's claim for California workers' compensation benefits in California, but was ultimately found liable for Cromp-

ton's California workers' compensation benefits pursuant to a California Workers' Compensation Appeals Board decision dated May 4, 1993. CIIC thereafter paid Crompton benefits in accordance with California workers' compensation law. However, believing that the benefits afforded by Hawai'i's workers' compensation scheme were more generous than those afforded by California law, Crompton, on or about September 18, 1991, filed a claim for workers' compensation benefits with the Disability Compensation Division of the State Department of Labor and Industrial Relations (DLIR) in Hawai'i, seeking recovery of the difference between the respective benefits accorded by California and Hawai'i law.

Thereafter, on January 3, 1992, Crompton filed a negligence action in the First Circuit Court in Hawai'i against Rib–Roof and KAC for the injuries he suffered on September 12, 1990, while working for KAC.[1] Crompton filed the civil suit against Rib–Roof and KAC premised on the theory that Tern, and not Rib–Roof or KAC, was Crompton's "statutory employer," and, therefore, neither Rib–Roof nor KAC were entitled to immunity against suits based on negligence pursuant to Hawai'i Revised Statutes (HRS) § 386–5 (1993).[2]

By decision dated June 17, 1992, the Director of the DLIR (the Director) determined that Crompton suffered a work-related injury on September 12, 1990, and awarded Crompton benefits. Because KAC failed to carry insurance or provide security for workers' compensation benefits for its employees in Hawai'i as required by HRS § 386–121 (1993),[3] the Director also assessed

---

1. Crompton's mother, Sharon Fraser, also brought a claim for loss of filial consortium in the same action.

2. HRS § 386–5 provides in pertinent part:
   **Exclusiveness of right to compensation; exception.** The rights and remedies herein granted to an employee or the employee's dependents on account of a work injury suffered by the employee shall exclude all other liability of the employer to the employee, the employee's legal representative, spouse, dependents, next of kin, or anyone else entitled to recover damages from the employer, at common law or otherwise, on account of the injury[.]
   (Bold emphasis in original.)

3. HRS § 386–121 provides:
   **Security for payment of compensation; misdemeanor.** (a) Employers, except the State, any county or political subdivision of the State, or other public entity within the State, shall secure compensation to their employees in one of the following ways:
   (1) By insuring and keeping insured the payment of compensation with any stock, mutual, reciprocal, or other insurer authorized to transact the business of workers' compensation insurance in the State;
   (2) By depositing and maintaining with the state director of finance security satisfactory to the director of labor and industrial rela-

KAC a penalty pursuant to HRS § 386–123 (1993).[4]

As Crompton's direct employer, KAC was primarily liable for Crompton's workers' compensation benefits pursuant to HRS § 386–1 (1993).[5] However, because KAC was uninsured for Hawai'i workers' compensation coverage, the Director held a hearing on March 10, 1994 to determine which company was secondarily liable to Crompton for Hawai'i workers' compensation benefits pursuant to HRS § 386–1. At the hearing, Rib–Roof, undoubtedly seeking to avail itself of immunity under HRS § 386–5, represented that, as of the date of the hearing, it was ready, willing, and able to pay workers' compensation benefits due Crompton under Hawai'i law, despite the fact that it carried no Hawai'i workers' compensation insurance coverage. After the hearing, the Director took the matter under advisement.

After the hearing, but before the issuance of the Director's decision, Crompton and Rib–Roof settled the tort action for $600,000.00.[6] The Settlement, Release, and Indemnity Agreement, dated April 20, 1994, provided in pertinent part:

> 1. *Release.* For and in consideration of the promise by RIB–ROOF, INC. (hereinafter referred to as Releasee), to as soon as possible, but in any case within two weeks from the date of this Agreement,

---

> tions securing the payment by the employer of compensation according to the terms of this chapter;
> (3) Upon furnishing satisfactory proof to the director of the employer's solvency and financial ability to pay the compensation and benefits herein provided, no insurance or security shall be required, and the employer shall make payments directly to the employer's employees, as they may become entitled to receive the same under the terms and conditions of this chapter;
> (4) By membership in a workers' compensation self-insurance group with a valid certificate of approval under section 386–194; or
> (5) By membership in a workers' compensation group insured by a captive insurer under chapter 431, article 19.
> Any person who wilfully misrepresents any fact in order to obtain the benefits of paragraph (3) shall be guilty of a misdemeanor.
> (b) Any decision of the director rendered under paragraphs (2) and (3) of subsection (a) of this section with respect to the amount of security required or refusing to permit no security to be given shall be subject to review on appeal in conformity with sections 386–87 and 386–88.

(Bold emphasis in original.)

4. HRS § 386–123 provides:

> **Failure to give security for compensation; penalty; injunction.** If an employer fails to comply with section 386–121, the employer shall be liable for a penalty of not less than $250 or of $10 for each employee for every day during which such failure continues, whichever sum is greater, to be recovered in an action brought by the director in the name of the State, and the amount so collected shall be paid into the special compensation fund created by section 386–151. The director may, however, in the director's discretion, for good cause shown, remit all or any part of the penalty in excess of $250, provided the employer in default complies with section 386–

> 121. With respect to such actions, the attorney general or any county attorney or public prosecutor shall prosecute the same if so requested by the director.
> In addition, if any employer is in default under section 386–121 for a period of thirty days, the employer may be enjoined, by the circuit court of the circuit in which the employer's principal place of business is located, from carrying on the employer's business anywhere in the State so long as the default continues, such action for injunction to be prosecuted by the attorney general or any county attorney if so requested by the director.

(Bold emphasis in original.)

5. HRS § 386–1 provides in pertinent part:

> Whenever an independent contractor [*i.e.* a general contractor] undertakes to perform work for another person pursuant to contract, express or implied, oral or written, the independent contractor shall be deemed the employer of all employees performing work in the execution of the contract, including employees of the independent contractor's subcontractors and their subcontractors. However, the liabilities of the direct employer of an employee who suffers a work injury shall be primary and that of the others secondary in their order. An employer secondarily liable who satisfies a liability under this chapter shall be entitled to indemnity against loss from the employer primarily liable.

6. The claim against KAC apparently went to trial on April 11, 1994. KAC failed to appear. The trial court, by findings of fact and conclusions of law filed on May 5, 1994, determined that Rib-Roof and KAC were jointly and severally liable for Crompton's damages, totalling $1,495,124.40. The trial court took into account the $600,000.00 settlement between Crompton and Rib–Roof and held that KAC was liable for the balance of Crompton's damages, or $895,124.40.

deliver to Cades Schutte Fleming & Wright [Crompton's attorneys] a check in the amount of $600,000.00 made payable to the order of Mark Crompton, Sharon Fraser and Cades Schutte Fleming & Wright", MARK CROMPTON and SHARON FRASER (hereinafter collectively referred to as "Releasor") hereby release and forever discharge Releasee and its insurance carrier, Northbrook Property & Casualty, from and on account of any and all claims, actions, causes of action, and damages of whatever name or nature, which in any manner concern or relate to any of the following:

a. An accident which Mark Crompton was involved in while he was employed in the erection of a building on 9/12/90 at Campbell Industrial Park, Oahu, Hawaii (hereinafter referred to as the "Accident").

b. That certain lawsuit instituted by Releasor in the Circuit Court of the First Circuit, State of Hawaii, Civil No. 92–0005–01 (hereinafter referred to as the "subject lawsuit").

. . . .

It is further agreed and understood that the $600,000.00 being paid by Releasee is for general damages only and is not duplicative of any other benefits, including workers' compensation benefits, that have been or may be paid to Releasor.

. . . .

**3. *Releasor's further understandings and agreements.***

**d. *Complete Bar.*** Acceptance of the consideration above mentioned and execution of this Release is a complete and final bar to any and all claims, actions, causes of action, claims for relief, liability, liabilities, costs, expenses, fees, demands, injuries, losses, and damages of whatever name or nature against Releasee in any manner arising, growing out of, connected with or covered by this Release; and this Release forever and finally compromises, settles, and terminates any and all disputes, claims, claims for injury, loss, damage, costs, expenses and fees of whatever nature, known or unknown, in any manner arising, growing out of, connected with or in any manner involving, concerning or relating to the matters covered by this Release.

Thereafter, by decision filed May 6, 1994, the Director determined that Tern, the first contractor insured for Hawai'i workers' compensation coverage, was Crompton's "statutory employer" and was therefore secondarily liable for Crompton's workers' compensation benefits. The Director ordered Tern and First Insurance to pay for Crompton's medical and temporary total disability benefits beginning September 15, 1990. Tern and First Insurance were allowed to credit toward the amount of their liability for workers' compensation benefits to Crompton the amount of workers' compensation benefits paid to Crompton by CIIC, but Tern and First Insurance were also required to reimburse CIIC for the amount of benefits CIIC paid to Crompton, subject to the maximum benefits allowable under Hawai'i's workers' compensation law. The Director also ruled that Tern/First Insurance was entitled to indemnity from KAC and Rib–Roof and was entitled to a lien against proceeds, if any, from Crompton's third-party action against Rib–Roof to the extent of any workers' compensation benefits Tern/First Insurance paid to Crompton. Tern and First Insurance appealed the Director's decision to the LIRAB.

Once before the LIRAB, Tern/First Insurance filed a motion for summary judgment, or in the alternative, for a dismissal. CIIC also moved to amend the Director's decision. By decision filed August 31, 1995, the LIRAB granted Tern/First Insurance's motion, ruling that: (1) Rib–Roof, and not Tern/First Insurance, was secondarily liable for Crompton's workers' compensation benefits; and, (2) although Rib–Roof was secondarily liable, Crompton's claim for benefits from Rib–Roof be denied because the settlement, release, and indemnity agreement entered into by Crompton and Rib–Roof in connection with Crompton's tort action against Rib–Roof absolved Rib–Roof of all claims arising out of the accident. This timely appeal followed.

## II. *STANDARD OF REVIEW*

It is well settled that:

We review [a] circuit court's award of summary judgment *de novo* under the same standard applied by the circuit court. *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 104, 839 P.2d 10, 22, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992) (citation omitted). As we have often articulated,

> [s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is *no genuine issue as to any material fact* and that the moving party is entitled to a judgment as a matter of law.

*Id.* (emphasis added) (citation and internal quotation marks omitted); *see* Hawai'i Rules of Civil Procedure (HRCP) Rule 56(c) (1990). "A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of ·a cause of action or defense asserted by the parties." *Hulsman v. Hemmeter Dev. Corp.*, 65 Haw. 58, 61, 647 P.2d 713, 716 (1982) (citations omitted). *State by Bronster v. U.S. Steel Corp.*, 82 Hawai'i 32, 39, 919 P.2d 294, 301 (1996) (quoting *Maguire v. Hilton Hotels Corp.*, 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995)).

■ The issue on appeal involves statutory interpretation. We have often noted that:

> The interpretation of a statute is a question of law reviewable *de novo*. In so doing, our primary duty in interpreting and applying statutes is to ascertain and give effect to the legislature's intention to the fullest degree. Although the intention of the legislature is to be obtained primarily from the language of the statute itself, we have rejected an approach to statutory construction which limits us to the words of a statute, for when aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no rule of law which forbids its use, however clear the words may appear on superficial examination. Thus, the plain language rule of statutory construction, does not preclude an examination of sources other than the language of the statute itself even when the language appears clear upon perfunctory review. Were this not the case, a court may be unable to adequately discern the underlying policy which the legislature seeks to promulgate and, thus, would be unable to determine if a literal construction would produce an absurd or unjust result, inconsistent with the policies of the statute.

*Sato v. Tawata*, 79 Hawai'i 14, 17, 897 P.2d 941, 944 (1995) (citations, brackets, quotation marks, and ellipses omitted).

### III. *DISCUSSION*

### A. *The LIRAB Properly Determined that Rib–Roof Was Secondarily Liable for Crompton's Workers' Compensation Benefits.*

Crompton's principal argument on appeal is that the LIRAB erred in granting summary judgment in favor of Tern/First Insurance based on its conclusion that Rib–Roof, and not Tern, was secondarily liable for Crompton's workers' compensation benefits. Crompton asserts that the LIRAB's conclusion is incorrect because HRS § 386–1 assigns secondary liability to the first *insured* party "up the chain" of subcontractors. We disagree for three principal reasons: (1) the plain meaning of the language of HRS § 386–1 assigns secondary liability for an injured worker's workers' compensation benefits to the next subcontractor above the primarily liable employer in default without regard to whether that subcontractor carries insurance to cover workers' compensation benefits mandated by Hawai'i's workers' compensation statutes; (2) the legislative history does not support Crompton's position; and (3) the authorities cited by Crompton are distinguishable and/or inapposite.

1. **The Plain Meaning of the Language of HRS § 386–1 Assigns Secondary Liability for an Injured Worker's Workers' Compensation Benefits to the Next Subcontractor or Contractor in Order Above the Primarily Liable Subcontractor in Default, Without Regard to Whether that Subcontractor or Contractor Has Workers' Compensation Insurance.**

■ As previously noted, HRS § 386–1 provides in pertinent part that:

Whenever an independent [general] contractor undertakes to perform work for another pursuant to contract, ... the independent contractor shall be deemed the employer of all employees performing work in the execution of the contract, including employees of the independent contractor's subcontractors and their subcontractors. However, the liabilities of the direct employer of an employee who suffers a work injury shall be primary and that of the others secondary *in their order.* An employer secondarily liable who satisfies a liability under this chapter shall be entitled to indemnity against loss from the employer primarily liable.

(Emphasis added.)

HRS § 386–1 sets out a scheme whereby the direct employer of an employee who suffers a work injury is primarily liable to the employee for workers' compensation benefits. In the event that the direct employer is unable or unwilling to pay, secondary liability for the employee's workers' compensation benefits passes to the next contractor or subcontractor *in order*, with ultimate liability falling on the general contractor.[7] HRS § 386–1 is silent with regard to the insured status of the secondarily liable subcontractor or contractor or the subcontractor's or contractor's ability to satisfy liability.

■ Contrary to Crompton's position, the plain meaning of the language of HRS § 386–1 provides that secondary liability is assigned to the next subcontractor in order regardless of whether that subcontractor is insured. Pursuant to this scheme, secondary liability is assigned to the next subcontractor or contractor up the chain, and only if that subcontractor is unable to pay benefits is the secondary liability assigned to the next subcontractor or contractor up the chain. Crompton's reading of HRS § 386–1 effectively would have us insert a condition in

HRS § 386–1 not supported by the plain language of the statute, and we decline to do so. As we have previously noted, "[s]tatutory construction permits the implication of words apparently intended for the purpose of upholding and giving force to the legislative will, but does not authorize the interpolation of conditions into a statute—additional terms—not found in the statute considered as a whole." *Hawaii Pub. Employment Relations Bd. v. United Pub. Workers*, 66 Haw. 461, 469–70, 667 P.2d 783, 789 (1983) (citation omitted).

### 2. The Legislative History of HRS § 386–1 Does Not Support Crompton's Position.

■ Crompton next argues that the legislative history of HRS § 386–1 indicates that the legislature intended that, when a contractor or subcontractor has failed to provide an employee with workers' compensation benefits as required under the law, only the next *insured* contractor up the chain is liable for the employee's workers' compensation benefits if he or she is injured. We disagree.

The precursor to HRS § 386–1 was enacted in 1915 and provided:

"Employer[,]" unless otherwise stated, includes any body of persons, corporate or unincorporated, public or private, and the legal representative of a deceased employer. It includes the owner or lessee of premises, or other person who is virtually the proprietor or operator of the business there carried on, but who, by reason of there being an independent contractor, or for any other reason, is not the direct employer of the work[er] there employed. If the employer is insured it includes his [or her] insurer as far as applicable.

1915 Haw.Sess.L.Act 221, § 60 at 347.

In 1963, the legislature revised and recodified Hawai'i's workers' compensation laws

---

7. HRS § 386–56 (1993), however, provides in pertinent part that:

Where an injured employee or the employee's dependents fail to receive prompt and proper compensation and this default is caused through no fault of the employee, the director shall pay the full amount of all compensation awards and benefits from the special compensation fund to the employee or dependent.

The employer, upon order of the director, shall reimburse the special compensation fund for the sums paid therefrom under this section, and the fund, represented by the director, shall be subrogated to all the rights and remedies of the individual receiving the payments.

and enlisted the assistance of Professor Stefan A. Riesenfeld, a noted authority on workers' compensation. Relative to the successive liability of contractors for an injured employee's workers' compensation benefits, Professor Riesenfeld suggested that language regarding the impact of the direct employer's insured status on the tort liability of the owner and the owner's other employees be included in the relevant provisions. Detailing his proposals, Professor Riesenfeld noted:

The "contractor clause" contained in the existing definition of "employer" is rephrased and transferred to the definition of "employee". This positional shift is made for the reason that the effect of the clause is to make the employees of the contractor the "statutory employees" of the owner of the business who has contracted out the particular job.

It is recommended, however, that the present rule be qualified so as to place either the exclusive or the primary liability on the direct employer, *if he [or she] has taken out compensation insurance* and the wages of the employee figure in the premium base. The difference between placing the "exclusive" liability on the employer rather than the "primary" liability lies in the effect of this distinction on the tort liability of the owner and his [or her] other employees. If it is desired to shield the owner and his [or her] other employees from third party liability, then secondary liability must be left imposed upon the owner. Vice versa, if it is desired to give the victim in cases of negligence an action at law either against the owner or his [or her] negligent employees, the direct employer must be exclusively liable.

The suggested form of the statutes makes the *insured* direct employer exclusively liable.

S. Riesenfeld, *Study of the Workmen's Compensation Law in Hawaii*, Report No. 1, 99–100 (1963) (emphases added).

The relevant senate committee report indicates that the Senate favorably received Professor Riesenfeld's proposal, and noted: "[t]he 'contractor clause' contained in the existing definition of *employer* is rephrased and

transferred so that exclusive liability is placed on the direct employer, **if he [or she] has taken out compensation insurance** and the wages of the employee figure in the premium base." Sen.Stand.Comm.Rep. No. 334, in 1963 Senate Journal, at 789 (underscored emphasis in original) (bold emphasis added). Crompton essentially argues that the Senate's endorsement and incorporation of the principles suggested in Professor Riesenfeld's report indicates that the legislature intended secondary liability for workers' compensation benefits to fall on the next *insured* contractor in line above the defaulting primarily liable direct employer.

However, as a subsequent committee report indicates, the House deleted the provision proposed by Professor Riesenfeld:

The paragraph in section 97–1 referring to the responsibility of independent contractors or owners or lessees of premises has been deleted and the following substituted therefor:

Whenever an independent contractor undertakes to perform work for another person pursuant to contract, express or implied, oral or written, such independent contractor shall be deemed the employer of all employees performing work in the execution of the contract, including employees of his [or her] subcontractors and their subcontractors. However, the liability of the direct employer of an employee who suffers a work injury shall be primary and that of the others secondary in their order. An employer secondarily liable who satisfies a liability under this chapter shall be entitled to indemnity against loss from the employer primarily liable.

. . . .

Your Committee has amended the provision relating to work undertaken by an independent contractor for another person so that the contractor shall be deemed the employer of all employees performing work under the contract. The primary liability, however, is placed on the direct employer and the secondary liability on the indirect employer. Since section 97–55 has been amended so that the injured employee or his dependents are assured of receiv-

ing their proper compensation in case the responsible employer defaults, no inequity will be imposed on an employee by elimination of the proviso making the owner or lessee of a premise, the statutory employer of the employee.

Hse.Stand.Comm.Rep. No. 889, in 1963 House Journal, at 822–23.

The House version of the bill was eventually enacted. Although Crompton correctly notes that the committee reports do not explain the deletion of the reference to insurance, contrary to Crompton's position, the legislative history of HRS § 386–1 does clearly indicate that the legislature ultimately rejected Professor Riesenfeld's proposal and did, in fact, delete all reference to insurance.

Moreover, as noted in *Fonseca v. Pacific Construction Co., Ltd.*, 54 Haw. 578, 513 P.2d 156 (1973), we have previously rejected Crompton's position regarding Professor Riesenfeld's proposal to amend HRS § 386–1:

The House Standing Committee Report No. 889 on Senate Bill No. 853, 1963 House Journal at pp. 821–24, reveals that the House changes in the Senate version were ultimately enacted into law. It is, however, unrevealing as to legislative intent, merely repeating the statutory language itself.

The Report does state that the language of the bill is "based in large measure, though not exclusively, on the recodification ... recommended by Dr. Stefan A. Riesenfeld, Professor of Law." These recommendations can be found in the "Study of the Workmen's Compensation Law in Hawaii," prepared by the Legislative Reference Bureau (Report No. 1: 1963).

Though urged by the appellants to adopt the view proposed in the Riesenfeld study, we decline to do so for two reasons. As we said in *Twentieth Century Furniture v. Labor and Indus. Relations Appeal Bd.*, 52 Haw. 577, 580, 482 P.2d 151, 153 (1971) with regard to this same problem:

First, we think that studies made by non-members of the legislature are not the most persuasive evidence of legislative intent. Certainly studies do not have the probative value of committee reports or debates. Professor Riesenfeld was an expert on matters of work[ers'] compensation, yet we cannot be sure that his ideas on the subject can be equated with the will of the legislature. Certainly, the legislature has the power to pick and choose from the ideas presented to it.

Second, § 386–1 as amended was apparently part of that which was not exclusively based on Riesenfeld's recommendations, since its language differs considerably from the proposed recodification. *Compare* "Study", *supra*, p. 121, with the statute as enacted.

*Id.* at 581 n. 1, 513 P.2d at 158 n. 1.

Additionally, also contrary to Crompton's position, this court determined in *Fonseca* that the underlying purpose of providing for the contingent liability of general contractors was not to ensure compensation of the injured employee or to grant third-party immunity, but to protect the special compensation fund feature of the workers' compensation system:

Our determination of the legislature's meaning in making the primary-secondary distinction is obviously essential to the disposition of this case. Unfortunately, neither legislative history nor other supplemental sources offer interpretive aid. We are therefore compelled to analyze this distinction within the context of the work[ers'] compensation scheme as a whole to determine the intent of the legislature.

The appellants argue that the underlying purpose of providing for the contingent liability of general contractors was to protect the special compensation fund feature of the work[ers'] compensation system, rather than to enable a general contractor to escape third-party liability for its own negligence. We agree. *This special compensation fund, as provided in HRS § 386–56 and §§ 386–151 through 155 (Supp.1972), is financed by assessment of insurance carriers and self-insured employers and pays benefits in the event of default by an employer or an employer's insurance carrier.*

> *Employees and their dependents are thereby assured of compensation regardless of insurance, so § 386-1 cannot be for their benefit.*

*Id.* at 581-82, 513 P.2d at 158-59 (emphasis added) (footnote omitted). We went on to note in *Fonseca* that the "necessary work relationship" between the injured employee and the secondarily liable subcontractor or contractor comes into existence only when a subcontractor or contractor fails to provide benefits. We noted:

> While the first sentence of [HRS § 386-1] initially appears to confer blanket immunity on general contractors, further consideration leads us to the conclusion that the primary-secondary distinction contained in the second sentence of the section indicates that the legislature was not concerned with third-party tort liability, but rather with making each general contractor the guarantor of compensation for the employees of its subcontractors. Inserting general contractors between defaulting subcontractors and the special compensation fund effectively prevents unscrupulous subcontractors from using all self-insured employers and carriers to pay their work[ers'] compensation premiums, because prior to the enactment of § 386-1, the latter two groups were required to replenish the depleted fund. *Thus, as we interpret this section, its second sentence, by providing for secondary liability on the part of general contractors, confers the statutory employer status referred to in the first sentence [or HRS § 386-1] only at those times when this contingent liability becomes actual.*

> Our view that the legislative intent of § 386-1 was to protect the fund rather than grant third-party immunity is reinforced by the fact that its definition of general contractors as employers provides for none of the incidents of the employer-employee relationship; this relationship lies at the heart of the theory of work[ers'] compensation. In *Evanson v. University of Hawaii*, 52 Haw. 595, 598, 483 P.2d 187, 190 (1971), we said:

> > Work[ers'] compensation laws were enacted as a humanitarian measure, to create legal liability without relation to fault. *Silva v. Kaiwiki Mill. Co.*, 24 Haw. 324, 330 (1918). They represent a socially enforced bargain: the employee giving up his [or her] right to recover common law damages from the employer in exchange for the certainty of a statutory award for all work-connected injuries. Since liability is made dependent on a nexus to the job, the essential prerequisite for coverage under work[ers'] compensation acts is the existence of an employer-employee relationship.

> Once the employer and employee are deemed to be within the confines of the work[ers'] compensation system, the exact nature of the work relationship, particularly with regard to control over the work being performed, is unimportant insofar as the payment of benefits is concerned; the system is truly no-fault in this sense, since the employee collects benefits owed to him [or her] under any circumstances. The employer-employee relationship does, however, bear heavily upon whether the respective rights and responsibilities which work[ers'] compensation imposes are to be assumed by participation in the first instance.

> On the facts presented by this case, the necessary work relationship for third-party immunity is absent or, put another way, there is no *quid pro quo*. *Under the statute as we have construed it, the relationship comes into existence only when a subcontractor fails to provide benefits.*

*Id.* at 582-83, 513 P.2d at 159-60 (emphases added).

Crompton essentially argues that *Fonseca* was badly reasoned and that all statements contrary to his position are dicta. Crompton maintains that the LIRAB's holding, based in part on *Fonseca*, "would remove a potent incentive for general contractors to police their subcontractors for compliance with Hawaii law and would reward violators" in that "[a]n unscrupulous employer may see no advantage in securing workers' compensation insurance if it can later obtain the benefits of immunity from an injured employee's civil action by simply offering to pay his or her workers' compensation benefits." The infir-

mity in Crompton's position is that the injured employee's right to benefits is protected by such a holding; whether benefits come out of the employer's pocket directly or through the payment of insurance premiums, the employee is protected. Moreover, assigning secondary liability in order up the chain better ensures that all uninsured employers in the chain will be determined and appropriately penalized for failure to carry insurance.

Crompton further argues that one of the purposes of HRS § 386-1 is to create an incentive for general contractors to make sure their subcontractors acquire workers' compensation insurance. We disagree. The incentive asserted by Crompton is effected not by requiring the assignment of secondary liability for workers' compensation benefits to the first insured, but rather by the provision of HRS § 386-1, allowing for an indemnity action against the employer who is primarily liable. If a general contractor, who, by the express terms of HRS § 386-1, is ultimately responsible for the workers' compensation benefits of all of the employees on the job, possesses an indemnity action against a subcontractor, it certainly behooves the general contractor to ascertain before entering into a subcontracting agreement that the subcontractor is either able to pay workers' compensation benefits or is insured for workers' compensation coverage. This is inherent in the scheme mandated by HRS § 386-1 without the mandatory assignment of secondary liability on the first insured subcontractor or contractor.

Therefore, Crompton's argument that the legislature intended that, when a contractor or subcontractor has failed to provide an employee with workers' compensation benefits as required under the law, only the next *insured* contractor up the chain is liable for workers' compensation benefits if an employee is injured is meritless. Accordingly, we hold that a literal reading of HRS § 386-1, that is, that secondary liability is assigned to the next subcontractor in order regardless of whether that subcontractor is insured, does not produce absurd or unjust results and is wholly consistent with the purposes and policies of the statute.

### 3. The Authorities Cited by Crompton Are Distinguishable and/or Inapposite.

In support of his position, Crompton relies on the following statement from Professor Larson:

Forty-three states [including Hawai'i] have adopted "contractor-under" statutes, imposing on the general employer compensation liability (sometimes joint, sometimes primary, but usually secondary) to the employees of contractors (in most instances uninsured contractors) under him [or her].

. . . .

The purpose of this legislation was to protect employees of irresponsible and uninsured subcontractors by imposing ultimate liability on the presumably responsible principal contractor, who has it within his [or her] power, in choosing subcontractors, to pass upon their responsibility and insist upon appropriate compensation protection for their workers. This being the rationale of the rule, in the increasingly common situation displaying a hierarchy of principal contractors upon subcontractors upon sub-subcontractors, if an employee of the lowest subcontractor on the totem pole is injured, there is no practical reason for reaching up the hierarchy any further than the first insured contractor. Thus, *In re Van Bibber's Case,* [343 Mass. 443, 179 N.E.2d 253 (1962)] an insured general contractor engaged an insured subcontractor who in turn engaged an uninsured sub-subcontractor. The subcontractor was held liable for the compensation payable to an injured employee of the sub-subcontractor. The general contractor was held not liable.

. . . .

The statute also aims, not always successfully, to forestall evasion of the act by those who might be tempted to subdivide *their regular operations among subcontractors,* thus escaping direct employment relations with the workers and relegating them for compensation protection to small contractors who fail to carry (and, if small enough, may not even be required to carry) compensation insurance.

1C A. Larson, *The Law of Workmen's Compensation*, §§ 49.12—49.14 (1996) at 9–1—9–31 (footnotes omitted) [hereinafter, *Larson* ].

Relying on *Larson*, Crompton argues that the purpose of HRS § 386–1 is not to protect the special fund feature of Hawai'i's workers' compensation system; rather, in keeping with his reading of our statements in *Fonseca*, Crompton submits that the purpose of HRS § 386–1 is to immunize a general contractor from suit when a subcontractor fails to *prospectively* secure benefits in the form of insurance. Pursuant to this rationale, primary liability for an injured employee's workers' compensation benefits would not shift to a general contractor (or a subcontractor above the primarily liable employer) in the event that the primarily liable employer's insurance company is insolvent. We disagree for two reasons.

First, we acknowledge that, similar to the rationale we expressed earlier in *Fonseca*, that, Professor Larson, who is a well-respected authority in the field of workers' compensation, did not sit on the Hawai'i legislature. Although we have relied on *Larson* as an invaluable resource in the field of workers' compensation and undoubtedly will continue to rely on it in the future, it is not a substitute for legislative history, and it will not carry authority as a definitive statement of the Hawai'i legislature's intent when it enacted HRS § 386–1.

Second, even if we were to indulge *Larson* as an authoritative statement, we decline to read *Larson* as standing for the proposition that insurance is the sole determining factor in the assignment of secondary liability for an injured employee's workers' compensation benefits. Rather, the general proposition stated in *Larson* that, "if an employee of the lowest subcontractor on the totem pole is injured, there is no practical reason for reaching up the hierarchy any further than the first *insured* contractor," *id.*, § 49.14, at 9–26 (emphasis added), is merely a restatement of the fundamental idea that an *insured* subcontractor is able to pay benefits. In this light, it would be inconsistent with the statement in *Larson*—that the purpose of statutes like HRS § 386–1 is to protect the injured employee's statutory right to receive workers' compensation benefits—to hold that secondary liability for an injured employee's workers' compensation benefits should not be assigned to a subcontractor immediately above the defaulting, primarily liable employer, who is ready, willing, and able to satisfy the liability, but be assigned instead to the general contractor, simply because the general contractor is insured and the subcontractor is not.

Similarly, Crompton's reliance on *Minnaugh v. Topper & Griggs, Inc.*, 69 A.D.2d 965, 416 N.Y.S.2d 348 (N.Y.App.Div.1979), is also misplaced. In *Minnaugh*, claimant was injured while working for Pal Sheet Metal, Inc. (Pal), one of the subcontractors on a construction project. The general contractor on the project had entered into agreements with some thirteen subcontractors, including appellant Topper & Griggs, Inc. (Topper), which subcontracted work to Bouras Co. (Bouras), which, in turn, subcontracted with Pal. Because Pal and Bouras were uninsured, the New York Workers' Compensation Board assigned secondary liability to Topper. There was no indication whether Pal or Bouras were willing or able to satisfy the liability for benefits to the claimant. Topper appealed, asserting that the board erroneously applied section 56 of New York's Workers' Compensation Law to Topper because it was a subcontractor not contractually related to the uninsured employer and section 56 applies to a general contractor.

Holding that secondary liability was properly assigned to Topper, the Appellate Division of the Supreme Court of New York stated that "[t]he purpose of the statute ... is to protect an injured employee and place liability on the *insured* contractor or subcontractor nearest to the uninsured employer in the chain of subcontractors." *Id.* 416 N.Y.S.2d at 349 (emphasis added).

Despite these general statements, however, *Minnaugh* does not stand for the proposition that secondary liability should be assigned to a subcontractor or contractor one step removed from a subcontractor nearer to the defaulting employer simply because the subcontractor or contractor one step removed is insured and the nearer subcontractor is not. Unlike Rib–Roof in the present

case, in *Minnaugh*, the uninsured subcontractor between the defaulting employer and the insured subcontractor, Bouras, did not indicate that it was ready, willing, and able to pay the claimant's workers' compensation benefits despite its lack of insurance. Similar to the rationale in *Larson*, the court in *Minnaugh* ultimately assigned secondary liability to Topper not simply because Topper had insurance, but because Topper could satisfy the liability for the claimant's benefits.

Based on the foregoing, we hold that the LIRAB correctly concluded that Rib–Roof is secondarily liable for Crompton's workers' compensation benefits.

B. *Because Rib–Roof, and Not Tern, Is Secondarily Liable for Crompton's Workers' Compensation Benefits, the Issue of the Effect of the Release on Tern's Liability Is Moot.*

Crompton argues that his settlement with Rib–Roof does not bar his claim for workers' compensation benefits against Tern and First Insurance and asserts that "in the [w]orkers' [c]ompensation setting, settlement with one employer does not result in the discharge of another employer as long as there is no duplication of benefits." In view of our holding that the LIRAB correctly concluded that Rib–Roof is secondarily liable for Crompton's workers' compensation benefits, the issue of the effect of the release executed by Crompton associated with the settlement of his tort action against Rib–Roof on *Tern's* liability is moot.

## IV. CONCLUSION

Based on the foregoing, the decision and order of the LIRAB granting summary judgment in favor of Tern and First Insurance is affirmed.