978 P.2d 700

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Mervin DUDOIT, Jr., Defendant–Appellant.**

**No. 21417.**

Supreme Court of Hawai'i.

April 26, 1999.

Reconsideration Denied June 9, 1999.

---

John N. Ikenaga, Deputy Public Defender, on the briefs, for the defendant-appellant Mervin Dudoit, Jr.

Jerry W. Hupp, Deputy Prosecuting Attorney, on the briefs, for the plaintiff-appellee State of Hawaiʻi.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by LEVINSON, J.

The defendant-appellant Mervin Dudoit, Jr. appeals solely with regard to his sentence in connection with his conviction of two counts of abuse of a family or household member, in violation of Hawaiʻi Revised Statutes (HRS) § 709–906 (Supp.1997).[1] On ap-

---

1. On September 14, 1997, the date on which the alleged offenses took place, HRS § 709–906 provided in relevant part:

**Abuse of family and household members; penalty.** (1) It shall be unlawful for any person, singly or in concert, to physically abuse a family or household member or to refuse com-

pliance with the lawful order of a police officer under subsection (4)....

For the purposes of this section, "family or household member" means spouses, former spouses, reciprocal beneficiaries, former reciprocal beneficiaries, parents, children, and per-

peal, Dudoit argues that the family court erred in sentencing him to a mandatory thirty-day jail term for the second count of the complaint, pursuant to the "repeat offender" provision of HRS § 709–906(5)(b), *see supra* note 1, because (1) the legislative history of HRS § 709–906(5) establishes that the legislature intended that the repeat offender provision apply only to offenses occurring after prior *convictions* of a violation of the statute, (2) the repeat offender provision cannot apply to offenses committed on the same day, and/or (3) the repeat offender provision cannot apply to offenses occurring within a short time of each other. We disagree with all of Dudoit's contentions. Accordingly, we affirm the family court's judgment, guilty conviction, and sentence.

## I. BACKGROUND

Dudoit was charged by way of a complaint, filed on October 2, 1997, with two counts of abuse of a family or household member in violation of HRS § 709–906. The complaint alleged that, on September 14, 1997, Dudoit "did intentionally, knowingly or recklessly engage in and cause physical abuse of a family or household member," naming, in two separate counts, Josette Dudoit (Count I) and Michelle Dudoit (Count II) as his victims.

On January 8, 1998, the family court conducted a change of plea hearing. In connection with Dudoit's plea of no contest as to both charges, the prosecution recited the following factual basis:

This occurred on September 14th, 1997 in the morning hours, about 9 a.m.[ ]

The defendant had come home the night before at about 3 a.m.[ ] His wife had locked the door, so the defendant slept [o]n the back deck. When his wife woke up, she did go outside and attempted to wake the defendant up and was asking the defendant for their son's money. Apparently, the defendant said he had the money but he didn't produce the money. So there was some argument about the money.

They all then went into the house. While in the house[,] the defendant kicked the victim when the victim was by the icebox. He kicked the icebox door into the victim and it hit her in the left arm area. He then also kicked her in the arm causing a big bruise from her elbow to her shoulder on her left arm that lasted for more than one week.

At that time[,] the victim's daughter, [Michelle], went to try to stop her father from beating up on the mom. [Michelle] grabbed the father and they then got into a fight. The father pulled [Michelle's] hair and punched her in the head about two to three times ... [,][a]t which time the mom then intervened, stopped the two of them from fighting, was able to get the daughter, and they ran over to their neighbor's house[,] which is also her brother's home.

A short time later[,] the defendant went to the brother-in-law's house and again got into another fight with ... both victim[s]. He kicked the daughter in the back. An independent witness then saw that[ ][and] ran to help the daughter. The defendant had the daughter by the hair at that time. His wife was in the house. The independent witness was able to break up the defendant from his daughter.

When the mom came outside, she then ... spit in the defendant's face and started to yell at him. And then he grabbed her

---

sons jointly residing or formerly residing in the same dwelling unit.

. . . .

(5) Abuse of a family or household member and refusal to comply with the lawful order of a police officer under subsection (4) are misdemeanors and *the person shall be sentenced as follows:*

(a) *For the first offense* the person shall serve a minimum jail sentence of forty-eight hours; and

(b) *For a second offense and any other subsequent offense that occurs within one year of the previous offense,* the person shall be termed a "repeat offender" and serve a minimum jail sentence of thirty days.

(6) Whenever a court sentences a person pursuant to subsection (5), it also shall require that the offender undergo any available domestic violence treatment and counseling programs ordered by the court. However, the court may suspend any portion of a jail sentence, except for the mandatory sentences under subsection (5)(a) and (b), upon the condition that the defendant remain arrest-free and conviction-free or complete court ordered counseling.

(Emphases added.)

by the hair and began slapping her on the head at the brother-in-law's house.

The independent witness then told the defendant to leave, at which time he did, and the police were called.

The defendant has no prior criminal record other than these charges. And with regard to the injuries [inflicted] on [Michelle], she did complain of pain to her head area where her hair had been pulled and punched, and she did have small scratch marks on the inside of her right arm which she complained of pain to.

The family court accepted Dudoit's no contest pleas and turned to the issue of sentencing. The parties disputed whether the "repeat offender" provision of HRS § 709–906(5) applied to Count II. The family court continued the sentencing hearing in order to study the issue further. On February 6, 1998, the family court conducted a final hearing on the issue. After hearing further arguments, the family court ruled that, by employing the terms "first offense" and "second and any other subsequent offense," HRS § 709–906 applies to the *commission* of successive violations of the statute, rather than to *convictions* of such violations. Although the family court acknowledged that the legislative history of the statute, as amended, suggested that the legislature had intended the repeat offender provision of HRS § 709–906 to pertain to subsequent *convictions*, it concluded that the statutory language, as actually enacted, "failed relatively miserably" to achieve that end. Accordingly, the family court ruled that Count II of the complaint was a "second offense" for purposes of HRS § 709–906(5) and that it was "compelled to issue the 30 day sentence" with respect to that count. The family court sentenced Dudoit to probation for a period of one year, subject, as one condition of probation, to incarceration of forty-eight hours in conjunction with Count I and thirty days in conjunction with Count II.

The family court's judgment was filed on February 9, 1998. Dudoit timely appealed on March 9, 1998.[2]

## II. STANDARDS OF REVIEW

### A. Sentencing

"The authority of a trial court to select and determine the severity of a penalty is normally undisturbed on review in the absence of an apparent abuse of discre-

2. We note that,

> [g]enerally, a guilty plea made voluntarily and intelligently precludes a defendant from later asserting any nonjurisdictional claims [on appeal], including constitutional challenges to the trial proceedings. Although the defendant may still challenge the sufficiency of the indictment or other like defects bearing directly upon the government's authority to compel the defendant to answer to charges in court, claims of nonjurisdictional defects in the proceedings, such as unlawfully obtained evidence and illegal detention, will generally not survive the plea. A plea of nolo contendere is equivalent to a plea of guilty in terms of waiving alleged nonjurisdictional defects.

*State v. Morin*, 71 Haw. 159, 162, 785 P.2d 1316, 1318 (1990) (citations omitted). *See also State v. Domingo*, 82 Hawai'i 265, 921 P.2d 1166 (1996) (following *Morin*). However, inasmuch as sentence is determined *after* a plea is accepted, and (absent a prior agreement between the parties) a defendant cannot know what sentence will be imposed, a plea of no contest or guilty does not constitute a waiver of an appeal of the *sentence* on the grounds that it is illegal. *See State v. Johnson*, 459 So.2d 1316, 1319 (La.Ct.App.1984) (Crain, J., concurring) ("[A] guilty plea coupled with an agreed upon sentence that is made part

of the record waives [the] right to appellate review of the sentence, but where there is no specific agreement in the record as to [the] sentence[,] it will be reviewed on appeal." (Citations omitted.)); *State v. Carroll*, 104 Ohio App.3d 372, 662 N.E.2d 65, 69–70 (1995) (holding that an express waiver of the right to appeal the sentence was invalid because the trial court had failed properly to advise the defendant and that the defendant therefore did not waive his right to appeal the legality of his sentence); *People v. Crum*, 175 A.D.2d 136, 572 N.Y.S.2d 25, 26 (1991) ("Since the defendant did not expressly waive the right to appeal his sentence on the plea, nor was this issue mentioned at his plea hearing, we find that his right to appeal the sentence was not waived." (Citations omitted.)); *Commonwealth v. Myers*, 481 Pa. 217, 392 A.2d 685, 687 (1978) ("[W]hen a defendant enters a plea of guilty, he waives his right to challenge on appeal all nonjurisdictional defects *except the legality of his sentence* and the validity of his plea." (Emphasis added.) (Citations omitted.)).

There is no indication in the record that Dudoit's changes of plea entailed either an agreement regarding the sentence to be imposed or an express waiver of Dudoit's right to appeal his sentence. Accordingly, Dudoit did not waive his right to bring the present appeal.

tion or unless applicable statutory or constitutional commands have not been observed." *State v. Valera,* 74 Haw. 424, 439, 848 P.2d 376, 383, *reconsideration denied,* 74 Haw. 650, 853 P.2d 542 (1993). *State v. Davia,* 87 Hawaiʻi 249, 253–54, 953 P.2d 1347, 1351–52 (1998) (quoting *State v. Cornelio,* 84 Hawaiʻi 476, 483, 935 P.2d 1021, 1028 (1997) (quoting *State v. Gaylord,* 78 Hawaiʻi 127, 143–44, 890 P.2d 1167, 1183–84 (1995))). "An abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or has disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Id.* at 253, 953 P.2d at 1351 (citations and internal quotation marks omitted).

### B. *Interpretation Of A Statute*

■ "[T]he interpretation of a statute … is a question of law reviewable *de novo.*" *State v. Arceo,* 84 Hawaiʻi 1, 10, 928 P.2d 843, 852 (1996) (quoting *State v. Camara,* 81 Hawaiʻi 324, 329, 916 P.2d 1225, 1230 (1996) (citations omitted)). *See also State v. Toyomura,* 80 Hawaiʻi 8, 18, 904 P.2d 893, 903 (1995); *State v. Higa,* 79 Hawaiʻi 1, 3, 897 P.2d 928, 930, *reconsideration denied,* 79 Hawaiʻi 341, 902 P.2d 976 (1995); *State v. Nakata,* 76 Hawaiʻi 360, 365, 878 P.2d 699, 704, *reconsideration denied,* 76 Hawaiʻi 453, 879 P.2d 558 (1994), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995).

*Gray v. Administrative Director of the Court,* 84 Hawaiʻi 138, 144, 931 P.2d 580, 586 (1997) (some brackets added and some in original). *See also State v. Soto,* 84 Hawaiʻi 229, 236, 933 P.2d 66, 73 (1997). Furthermore, our statutory construction is guided by established rules:

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.
>
> When there is doubt, doubleness of meaning, or indistinctness or uncertainty of an expression used in a statute, an ambiguity exists. . . .
>
> In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [ (1993) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

*Gray,* 84 Hawaiʻi at 148, 931 P.2d at 590 (quoting *State v. Toyomura,* 80 Hawaiʻi 8, 18–19, 904 P.2d 893, 903–04 (1995)) (brackets and ellipsis points in original) (footnote omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it … to discover its true meaning." HRS § 1–15(2) (1993). "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

*State v. Stocker,* 90 Hawaiʻi 85, 90–91, 976 P.2d 399, 404–05 (1999) (quoting *Ho v. Leftwich,* 88 Hawaiʻi 251, 256–57, 965 P.2d 793, 798–99 (1998) (quoting *Korean Buddhist Dae Won Sa Temple v. Sullivan,* 87 Hawaiʻi 217, 229–30, 953 P.2d 1315, 1327–28 (1998))).

### III. *DISCUSSION*

A. *The Repeat Offender Provision Of HRS § 709–906(5) Applies To The* **Commission** *Of Successive Violations Of HRS § 709–906 And Not Merely To Successive* **Convictions** *Of Such Violations.*

The legislature added the "repeat offender" language to HRS § 709–906(5) in 1992. *See* 1992 Haw. Sess. L. Act 290, § 7 at 750 (hereinafter, "Act 290"). In addition to the amendment to HRS § 709–906, Act 290 also amended, *inter alia,* HRS §§ 580–10 (relating to permanent restraining orders), 586–4 (relating to temporary restraining orders), and 586–11 (relating to protective orders). To each of these statutes, Act 290 added a "repeat offender" provision similar to that

added to HRS § 709–906. The relevant amendments to HRS §§ 580–10 and 586–4 provided in relevant part as follows: "For a first *conviction* ... the person shall serve a mandatory minimum jail sentence of forty-eight hours [and][f]or the second and any subsequent *conviction* ... the person shall serve a mandatory minimum jail sentence of thirty days." Act 290, §§ 1 and 2 at 745–47 (emphasis in original deleted) (emphases added). The relevant amendment to HRS § 586–11 provided as follows:

(1) For a violation of the order for protection that occurs after a *conviction* for a violation of the same order, a violator shall be sentenced to a mandatory minimum jail sentence of not less than forty-eight hours;

(2) For any subsequent violation that occurs after a second *conviction* for violation of the same order for protection, the person shall be sentenced to a mandatory minimum jail sentence of not less than thirty days.

*Id.,* § 6 at 749 (emphasis in original deleted) (emphases added). Thus, the three other "repeat offender" provisions created by Act 290 referred expressly to "conviction[s] for violation" of those statutes. By contrast, the amendments to HRS § 709–906(5) referred to "offenses." *See supra* note 1; *see also* Act 290, § 7 at 750.

The amendments to HRS § 709–906 were originally proposed in House Bill (H.B. No.) 3326. The House Judiciary Committee reported the purpose of the amendments as follows:

The nature of domestic abuse is such that ongoing violence is not uncommon and, in fact, has the great likelihood of becoming more serious and increasing in frequency. Your Committee understands that uniform sanctions applied in a graduated way in response to these serious offenses will deliver a strong message to the offenders, and compensate for any disparity in personal opinion or bias that may be held by an officer of the law or an officer of the court.

This bill was amended by making any person *convicted* of a second offense or any subsequent offense which occurs within one year of the previous offense to be termed a "repeat offender" for the purposes of sentencing and must serve a minimum jail sentence of thirty days.

Hse. Stand. Comm. Rep. No. 20–92, in 1992 House Journal, at 906 (emphasis added). When H.B. No. 3326 was sent to the Senate, it was consolidated, along with several other bills, into H.B. No. 3854, which had previously related only to temporary restraining orders. The Senate Judiciary Committee described its purpose in consolidating the bills as follows:

Your Committee ... found this bill[, *i.e.,* H.B. 3854,] to be an appropriate vehicle to consolidate several bills amending the provisions of chapter 586, a bill dealing with chapter 709 and a proposed amendment to chapter 580. *These bills were thematically related and consolidation provided a better prospect of consistency.* More specifically[,] the following bills were incorporated: H.B. 2605, H.D. 1 (§ 586–4 and –11), H.B. 3221, H.D. 1 (§ 585–5 and –6) and H.B. 3326, H.D. 1 (§ 709–906). In addition, a proposed amendment to section 580–10, Hawaii Revised Statutes was included.

. . . .

H.B. No. 3326, H.D. 1 proposed mandatory jail time, similar to the provision of H.B. No. 2605, H.D. 1 for abuse of a household member or refusal to comply with a lawful order of a police officer who is interceding in a domestic dispute. Your Committee amended the provisions of H.B. No. 3326[,] which were added to this bill to reflect the decisions made concerning the provisions taken from H.B. No. 2605, H.D. 1. *Your Committee notes that this consistency is achieved at the cost of reducing the currently applicable penalties. Consistency was chosen, over maintaining the more stringent penalties in the current law, primarily to highlight the issue for closer scrutiny by the conference committee[,] which is virtually necessary on a bill of this complexity.*

Sen. Stand. Comm. Rep. No. 2651, in 1992 Senate Journal, at 1181 (emphases added). The conference committee made further reference to the goal of "consistency": "This bill

is used as a vehicle to consolidate several bills amending the provisions of Chapter 586, HRS, a bill dealing with Chapter 709, HRS, and a proposed amendment to Chapter 580, HRS. *These bills are thematically related and consolidation provides a better prospect of consistency.*" Conf. Comm. Rep. No. 122, in 1992 House Journal, at 854 (emphasis added).[3]

Based on the foregoing legislative history, Dudoit argues that the legislature intended the "repeat offender" amendments to HRS §§ 580–10, 586–4, 586–11, and 709–906 to be "consistent," *i.e.,* to have the same effect. Thus, Dudoit urges that the legislature's use of the terms "first *offense*" and "second or subsequent *offense*" in HRS § 709–906(5) was, essentially, an error; the legislature, he maintains, intended, instead, that all of the repeat offender provisions effected by Act 290 apply to second or subsequent *convic-*

*tions* occurring after a first *conviction.* Dudoit further argues that the term "offense," as it appears in the statute, is ambiguous with respect to the question whether it refers to prior *convictions* or the *commission* of prior violations of the statute, and, in light of the above-described legislative intent, that it should be therefore construed in his favor.

■ As noted above, the family court agreed with Dudoit that the legislature had intended that the repeat offender provision of HRS § 709–906 be "consistent" with the repeat offender provisions of HRS §§ 580–10, 586–4, and 586–11, but, inasmuch as the legislature had "failed relatively miserably" to draft the statutes in a consistent manner, the family court concluded that it was constrained by the actual—and plain and unambiguous—language of HRS § 709–906. We agree with the family court's assessment.[4]

---

**3.** As the prosecution points out, HRS § 709–906 was again amended in 1998. *See* 1998 Haw. Sess. L. Act 172, § 8 at 645–47. Among the changes effected by Act 172 was the addition of the following sentences to HRS § 709–906(5):

Upon *conviction* and sentencing of the defendant, the court shall order that the defendant immediately be incarcerated to serve the mandatory minimum sentence imposed; provided that the defendant may be admitted to bail pending appeal pursuant to chapter 804. The court may stay the imposition of the sentence if special circumstances exist.

1998 Haw. Sess. L. Act 172, § 8 at 646 (emphasis in original deleted) (emphasis added). Act 172 also added a new subsection (7) to HRS § 709–906, providing as follows: "For any *subsequent offense* occurring within two years after a second misdemeanor *conviction,* the person shall be charged with a class C felony." *Id.,* § 8 at 647 (emphasis in original deleted) (emphases added).

As the prosecution observes, the legislature employed the term "conviction" in close proximity to its use of the term "offense" in its 1998 amendments to HRS § 709–906, to the extent of juxtaposing both the terms "offense" and "conviction" in the same sentence in HRS § 709–906(7), thereby indicating that the terms carried different meanings. *Cf. State v. Medeiros,* 89 Hawai'i 361, 368, 973 P.2d 736, 742 (Haw.1999) (holding that, where the terms "may" and "shall" "are used in the same statute, especially where [they] are used in close juxtaposition, we infer that the legislature realized the difference in meaning and intended that the verbs used should carry with them their ordinary meanings" (quoting *Gray,* 84 Hawai'i at 149, 931 P.2d at 591 (quoting *In re Tax Appeal of Fasi,* 63 Haw. 624, 626–27, 634 P.2d 98, 101 (1981) (citations

omitted))) (brackets in original)). However, the 1998 amendments do not apply to Dudoit in the present case because they became effective after the date of his alleged violations of HRS § 709–906. *See supra* note 1. This court employs *subsequent* legislative history only "to *confirm* its interpretation of an earlier statutory provision." *Macabio v. TIG Ins. Co.,* 87 Hawai'i 307, 317, 955 P.2d 100, 110 (1998) (citation and internal quotation marks omitted) (emphasis added). The legislature cannot change the intent behind a statute through subsequent amendments that do not have retroactive effect. Accordingly, inasmuch as the 1992 legislative history clearly suggests an intent contrary to that which the prosecution asserts is reflected in the 1998 amendment, the 1998 amendment is of little assistance for present purposes.

**4.** Because we deem the language of HRS § 709–906 to be plain and unambiguous, the present case is distinguishable from this court's recently published opinion in *State v. Mattiello,* 90 Hawai'i 255, 978 P.2d 693 (1999). In *Mattiello,* this court held that a facial conflict existed between the language of HRS § 712–1240 (1993), which provided in relevant part that, "as applied to liquids," " '[o]unce' means ... a fluid ounce," which is a measure of volume rather than of weight, and the phrase "[a] person commits the offense of promoting a dangerous drug in the first degree if the person knowingly ... distributes ... one or more ... mixtures ... of an *aggregate weight* of ... three-eighth *ounce* or more, containing any other dangerous drug," as employed in HRS § 712–1241(1)(b)(ii)(B) (1993). (Emphasis added.) This court held that "the juxtaposition of the words 'weight' and 'ounce' in HRS § 712–1241(1)(b)(ii)(B) injects some ambi-

Contrary to Dudoit's suggestion, the meaning of the term "offense," as employed in HRS § 709–906, is plain and unambiguous. As the term is commonly understood, an offense is "a breach of the criminal laws," *i.e.,* a "violation of law for which [a] penalty is prescribed." *Black's Law Dictionary* 1081 (6th ed.1990).[5] A "conviction," by contrast, is "[t]he final judgment on a verdict or finding of guilty, a plea of guilty, or a plea of nolo contendere[.]" *Id.* at 333.

The repeat offender sentencing enhancement contained in HRS § 709–906(5)(b) applies to "a second offense and any other subsequent offense *that occurs* within one year of the previous offense." (Emphasis added.) Dudoit asserts that "a charge does not become an 'offense' until after a conviction is obtained," citing to *People v. Nees,* 200 Colo. 392, 615 P.2d 690, 693 (1980) (holding that "it is not known legally that an offense has been committed until there is a conviction"). In other words, Dudoit argues that a previous *offense* does not "occur" for purposes of HRS § 709–906(5)(b), until the defendant is *convicted* of that offense. However, an examination of HRS § 709–906 *in pari materia* with other sections of the Hawai'i Penal Code (HPC) belies Dudoit's premise.

In HRS § 701–101 (1993), the legislature prescribed the manner by which the comprehensive 1986 amendments to the HPC would be implemented. HRS § 701–101(1) provides as follows:

Except as provided in subsection (2), amendments made by Act 314, Session Laws of Hawaii 1986, to this Code do not apply to *offenses committed* before the effective date of Act 314, Session Laws of Hawaii 1986. *Prosecutions for offenses committed* before the effective date of Act

314, Session Laws of Hawaii 1986, are governed by the prior law, which is continued in effect for that purpose, as if amendments made by Act 314, Session Laws of Hawaii 1986, to this Code were not in force. For purposes of this section, *an offense is committed before the effective date of Act 314* Session Laws of Hawaii 1986, *if any of the elements of the offense occurred before that date.*

(Emphases added.) In HRS § 701–101(1), therefore, the legislature unambiguously distinguished between the *commission* and *prosecution* of an offense and fixed the commission of an offense at the time when "any elements of the offense occurred." HRS § 701–102 (1993) provides in relevant part that "[n]o *behavior* constitutes an offense unless it is a crime or violation under this Code or another statute of this State." (Emphasis added.) Thus, HRS § 701–102 indicates that the HPC considers the behavior—*i.e.,* the culpable conduct—itself to be the "offense," rather than a conviction that results from the culpable behavior. HRS § 701–107 (1993) provides in relevant part:

**Grades and classes of offenses.** (1) *An offense* defined by this Code or by any other statute of this State for which a sentence of imprisonment is authorized *constitutes a crime.* Crimes are of three grades: felonies, misdemeanors, and petty misdemeanors....

(2) A crime is a felony if it is so designated in this Code or *if persons convicted thereof* may be sentenced to imprisonment for a term which is in excess of one year.

(Emphases added.) As the highlighted language indicates, HRS § 701–107 provides that one may be "convicted" of a "crime," which is a type of "offense."[6] In other

guity into the meaning of the term 'ounce.' " *Mattiello,* at 260, 978 P.2d at 698.

Although the legislative history appears to be at odds with the plain meaning of the statutory language in the present case, *see infra,* there is no facial incongruity in the statutory language itself. Accordingly, there is no ambiguity of the kind noted in *Mattiello.*

**5.** Dudoit points out that *Black's Law Dictionary* also defines "[s]econd offense" as "[o]ne committed after conviction for a first offense. It is the previous conviction, and not the indictment,

which is the basis of the charge of a second offense. *People v. Boardman,* 172 App. Div. 733, 159 N.Y.S. 577 [(1916)]." *Black's Law Dictionary* at 1081. *Boardman,* however, construed a very different statute. As the *Boardman* court noted, "the court is required by section 1941 of the Penal Law to act in imposing a sentence for a second conviction upon proof of a prior conviction alone." 159 N.Y.S. at 578.

**6.** The dissent misapprehends the implication of our observation in this regard, apparently concluding that, because one may be convicted of a

words, the terms "offense" and "conviction" have distinct meanings, because there must first be an "offense" before there can be a "conviction." Finally, HRS § 701–108(4) (1993) provides in relevant part that "[a]n offense is committed either when every element occurs, or, if a legislative purpose to prohibit a continuing course of conduct plainly appears, at the time when the course of conduct or the defendant's complicity therein is terminated." Thus, an offense "occurs" when the requisite conduct enumerated in the statutory elements of the offense, together with the requisite state of mind, have actually manifested themselves, rather than when they are adjudicated as having done so.

Construed together, HRS §§ 701–101, 701–102, 701–107, and 701–108 establish that the term "offense," as employed by the HPC, refers to the *commission* of the crime or violation[7] and not to the procedural events that transpire as a result of that commission, *e.g.*, prosecution, conviction (upon adjudication of guilt), and sentencing. Accordingly, the plain meaning of "offense," as employed in HRS § 709–906(5), precludes an interpretation equating it with the term "conviction."

crime, which is defined as a type of offense, "a conviction is merely a type of offense." Dissenting opinion at 279, 978 P.2d at 717. On the contrary, HRS § 701–107 divides "offenses" into two categories: "crimes" and "violations." "Crimes" are further subdivided in HRS §§ 701–107(1) through (4) into "felonies," "misdemeanors," and "petty misdemeanors." Conviction is a *consequence* of committing a "crime" or "violation," not a *type* of "crime" or "violation."

7.  HRS § 701–107(5) provides in relevant part:

    An offense defined by this Code or by any other statute of this State constitutes a violation if it is so designated in this Code or in the law defining the offense or if no other sentence than a fine, or fine and forfeiture or other civil penalty, is authorized upon conviction or if it is defined by a statute other than this Code which provides that the offense shall not constitute a crime....

8.  The dissent appears to assert that the language of a statute, no matter how plain and unambiguous, may be trumped by indications of a contrary meaning derived from legislative committee reports. However, as Justice Ramil himself aptly observed, as author of this court's opinion in *State v. Richie*, 88 Hawai'i 19, 30, 960 P.2d 1227, 1230 (1998), "[i]t is a cardinal rule of statutory interpretation that, where the terms of a statute

"[T]his court is ... willing to look beyond the plain, obvious, and unambiguous language of a statute, the facial constitutionality of which is not at issue, for the purpose of ascertaining its underlying legislative intent, but *only* if a literal construction 'would produce an absurd and unjust result.'" *State v. Buch*, 83 Hawai'i 308, 326–27, 926 P.2d 599, 617–18 (1996) (Levinson, J., concurring and dissenting) (citing *Sandy Beach Defense Fund v. City Council of the City and County of Honolulu*, 70 Haw. 361, 773 P.2d 250 (1989), and *Franks v. City and County of Honolulu*, 74 Haw. 328, 843 P.2d 668 (1993)) (emphasis in original) (footnote omitted).[8] *See also* HRS § 1–15(3) (1993) (providing that "[e]very construction which leads to an absurdity shall be rejected").

... [I]n *State v. Meyer*, 61 Haw. 74, 595 P.2d 288 (1979), despite a clear and unambiguous legislative history—as reflected in the relevant committee reports—of an intent to accomplish a particular result in amending the drug laws, this court held, by virtue of the plain language of its statutory work product, that "the [l]egislature did not carry its intention into effect." *Id.* at 76, 595 P.2d at 290. Accordingly, the

are plain, unambiguous and explicit, we are not at liberty to look beyond that language for a different meaning. Instead, our sole duty is to give effect to the statute's plain and obvious meaning." (Quoting *Alvarez v. Liberty House, Inc.*, 85 Hawai'i 275, 278, 942 P.2d 539, 542 (1997) (quoting *Ross v. Stouffer Hotel Co. (Hawai'i) Ltd., Inc.*, 76 Hawai'i 454, 461, 879 P.2d 1037, 1044–45 (1994))). *See also Konno v. County of Hawai'i*, 85 Hawai'i 61, 71, 937 P.2d 397, 407 (1997) ("[W]here the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning.") (Quoting *State v. Toyomura*, 80 Hawai'i 8, 18, 904 P.2d 893, 903 (1995) (quoting *Housing Finance & Dev. Corp. v. Castle*, 79 Hawai'i 64, 76, 898 P.2d 576, 588 (1995))); *Bumanglag v. Oahu Sugar Co., Ltd.*, 78 Hawai'i 275, 280, 892 P.2d 468, 473 (1995) (same) (citing *State v. Mezurashi*, 77 Hawai'i 94, 97, 881 P.2d 1240, 1243 (1994) (citing *AIG Hawaii Ins. Co. v. Estate of Caraang*, 74 Haw. 620, 634, 851 P.2d 321, 328 (1993))); *Ing v. Acceptance Ins. Co.*, 76 Hawai'i 266, 270, 874 P.2d 1091, 1095 (1994) (same) (citing *Caraang*, 74 Haw. at 634, 851 P.2d at 328); *Kuhnert v. Allison*, 76 Hawai'i 39, 44, 868 P.2d 457, 462 (1994) (same) (citing *Caraang*, 74 Haw. at 634, 851 P.2d at 328); *Lealaimatafao v. Woodward–Clyde Consultants*, 75 Haw. 544, 551, 867 P.2d 220, 224 (1994) (same) (citing *Caraang*, 74 Haw. at 634, 851 P.2d at 328).

*Meyer* court quoted *Queen v. San Tana,* 9 Haw. 106, 108 (1893), which it analogized to HRS § 701–104 (1976),[9] for the following "principle of construction" that, in its view, remained "sound":

> We cannot change the language of the statute, supply a want, or enlarge upon it in order to make it suit a certain state of facts. We do not legislate or make laws. *Even where the Court is convinced in its own mind that the Legislature really meant and intended something not expressed by the phraseology of the Act, it has no authority to depart from the plain meaning of the language used.*

*Meyer,* 61 Haw. at 77–78, 595 P.2d at 291 (emphasis added).

*Buch,* 83 Hawai'i at 325–26, 926 P.2d at 616–17 (Levinson, J., concurring and dissenting) (some brackets added and some in original).

Dudoit appears to assert that it would be absurd to accord the plain meaning to the term "offense," as employed in HRS § 709–906(5)(b), because it would conflict with the policies generally underlying repeat offender sentencing provisions. In support, he cites this court's opinion in *State v. Tavares,* 63 Haw. 509, 630 P.2d 633 (1981), in which this court construed HRS § 706–606.5(1)(b) (Supp.1980), which provided in relevant part, with respect to "any person convicted" of an enumerated list of offenses "who has a *prior conviction* for any of the ... enumerated offenses," for enhanced sentencing as follows: "for *each conviction* after the *first conviction,*" the offender should be sentenced to "a mandatory minimum period of imprisonment without possibility of parole during such period as follows: (a) *Second conviction*—5 years; (b) *Third conviction*—10 years." 63 Haw. at 510–11 n. 1, 630 P.2d at 635 n. 1 (emphases added). The issue before the *Tavares* court was whether it had been proper for the circuit court to consider the defen-

dant's prior convictions resulting from a two-count indictment as two separate prior convictions for purposes of enhanced sentencing pursuant to HRS § 706–606.5. *Id.* at 511, 630 P.2d at 635. Holding that HRS § 706–606.5(1) was ambiguous "as to whether one conviction can be considered to have occurred 'after' another conviction where both have been rendered simultaneously in one trial," the *Tavares* court determined that the statutory language was susceptible to two interpretations:

> One possible interpretation is that the legislature intended that each felony offense be committed after conviction for the preceding felony [in order] to warrant increased criminal penalties. Under this interpretation, convictions on several counts of an indictment which occur during the same trial would not be totalled up, but treated as "one" prior conviction. Another possible interpretation of the language of the statute is that a conviction on each count of an indictment represents a separate conviction for the purposes of adding up the number of convictions for sentencing. Under this interpretation, each conviction on a separate count would result in an enhanced criminal sentence.

*Id.* at 511–12, 630 P.2d at 635. The *Tavares* court then examined the case law of certain other jurisdictions and adopted the following statement of the general purpose of repeat offender sentencing statutes, as articulated by the Alaska Supreme Court in *State v. Carlson,* 560 P.2d 26 (Alaska 1977):

> As the court pointed out, "[h]abitual criminal statutes are founded on the general principle that persistent offenders should be subject to greater sanctions than those who have been convicted once." [*Carlson,* 560 P.2d] at 28. Moreover, the court emphasized that the increased sanctions under habitual offender statutes are reserved for criminals who have been given an op-

---

9. HRS § 701–104 (1993), which has never been amended, provides:

   **Principles of construction.** The provisions of this Code cannot be extended by analogy so as to create crimes not provided for herein; however, in order to promote justice and effect the objects of the law, all of its provisions shall be given a genuine construction, according to

the fair import of the words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision.

*Buch,* 83 Hawai'i at 325–26 n. 3, 926 P.2d at 616–17 n. 3 (Levinson, J., concurring and dissenting).

portunity to reform following a conviction, but who persist in violations of the law. *Id.* at 28–29. As the court stated, the rationale for this sentencing approach is that a convicted criminal who has not taken advantage of the opportunity to reform and subsequently commits another crime is a worse offender than one who has committed several crimes prior to any conviction. *Id.* at 30.

*Id.* at 513–14, 630 P.2d at 636–37. Accordingly, the *Tavares* court held that "convictions on several counts of an indictment are to be treated as only one conviction for the purposes of section 706–606.5(1)." *Id.* at 515, 630 P.2d at 637.

Unlike the statute at issue in the present case, *Tavares* construed a statute that, by its express terms, pertained to the consequences of prior and subsequent *convictions. See id.* at 515, 630 P.2d at 637 (noting, in connection with the legislative history of HRS § 706–606.5, that "[t]he focus here is on the commission of an offense by a felon who has already been convicted."). Moreover, although the policy rationale articulated in *Tavares* may be sensible, the legislature *could* rationally have intended a somewhat different purpose in enacting HRS § 709–906(5).

The provisions of HRS § 709–906(5)(b) send a message to abusers that repeated violations of the statute will result in harsher sentences, regardless of when their convictions of those offenses have occurred. So construed, the statute's deterrent effect would derive from the constructive knowledge that all individuals are charged with possessing with respect to the content of the HPC. *Cf.* Commentary to HRS § 702–220 (1993) (noting that a "mistaken belief by the defendant that the defendant's conduct is not legally prohibited by the penal law . . . must, in most instances, be held . . . [to] afford no excuse . . . "); *State v. Cavness*, 80 Hawai'i 460, 468, 911 P.2d 95, 103 (App.1996) (Kirimitsu, J., concurring and dissenting) (concluding that, in enacting HRS §§ 702–218 and 702–220, "the legislature eliminated generally the ignorance or mistake of law defense in order . . . [to] reflect the legal maxim, ignorance of the law excuses nobody" (footnote omitted)). Just as defendants are charged

by the HPC with constructive knowledge of the possibility, for example, of consecutive sentences for multiple crimes, *see Cornelio*, 84 Hawai'i at 494–95, 935 P.2d at 1039–40 (holding that a sentence imposing consecutive prison terms must "embody[, *inter alia,*] the forward-looking aim of future crime reduction or prevention (the deterrent goal)" (citation and internal quotation signal omitted)), so too may they be charged with constructive knowledge of enhanced sentences for multiple violations. *See, e.g.,* HRS §§ 706–661 (1993) and 706–662(4) (1993 & Supp.1998). Given such constructive knowledge, it is arguably not unjust to penalize an offender who has violated HRS § 709–906 and who has failed to "take[ ] advantage of the opportunity to reform" since his last unpunished violation, regardless of when it was committed, in the same fashion as an offender who has already been convicted of and punished for his first violation prior to committing his second.

In any case, this court has subsequently rejected the *Tavares* court's reasoning. In *Cornelio*, we noted that the *Tavares* court had failed to heed the provision, set forth in HRS § 706–660.5 (as it existed at that time), that "[t]he sentencing court may impose the above sentences consecutive to any other sentence *then* or previously *imposed* on the defendant." 84 Hawai'i at 489–90, 935 P.2d at 1034–35 (emphases added). *Cornelio* reasoned as follows:

Notwithstanding its attractiveness as a policy matter, the *Tavares* analysis disregarded the very rules of statutory construction that it purported to apply. In particular, the *Tavares* court was able to perceive ambiguity in the plain meaning of HRS § 706–606.5 only by pointedly ignoring the statute's proviso that "[t]he sentencing court may impose the [mandatory minimum prison] sentences [prescribed therein] consecutive to any other sentence *then* . . . imposed on the defendant[.]" (Emphasis added.) In the face of the proviso, the *only* "possible interpretation" of the repeat offender statute was that "a conviction on each count of an indictment represents a separate conviction for the purposes of adding up the number of con-

victions for sentencing," such that "each conviction on a separate count [could] result in an enhanced criminal sentence." *See Tavares*, 63 Haw. at 512, 630 P.2d at 635. Had it therefore adhered to the "basic tenet of statutory interpretation" that "where the language of [a] statute is plain and unambiguous, construction by the court is inappropriate, and the court is bound to give effect to the law, according to its plain and obvious meaning," *see id.* at 511, 630 P.2d at 635, the *Tavares* court could not have "look[ed] beyond [the] express language of the statute ... to the case law of other jurisdictions," as "extrinsic aids to [its] construction," for the purpose of holding that "convictions on several counts of an indictment are to be treated as only one conviction for the purposes of section 706–606.5(1)." *See id.* at 511–12, 515, 630 P.2d at 635–37.

84 Hawai'i at 491, 935 P.2d at 1036 (emphases and brackets in original) (footnote omitted). Because the legislature had amended HRS § 706–606.5 subsequent to *Tavares* in a manner essentially adopting that decision's approach to the statute, we perceived no need in *Cornelio* to expressly overrule *Tavares*, despite its faulty reasoning. *Id.* at 492, 935 P.2d at 1037.

It is therefore no surprise that, in *State v. Ramela*, 77 Hawai'i 394, 885 P.2d 1135 (1994), we reached a conclusion quite different from that of *Tavares*, in connection with our analysis of HRS § 712–1200(4) (Supp. 1992), a statute whose language mirrors, more closely than HRS § 706–606.5, the pertinent provisions of HRS § 709–906(5). In *Ramela*, the defendant

> was arrested for six separate offenses of prostitution, two occurring on the same evening. Prior to these offenses, [the defendant] had no criminal convictions. At arraignment, she pled not guilty to each offense.
>
> All of the offenses were consolidated for trial, at which time, [the defendant] indicated that she wished to change all of her pleas to guilty. Defense counsel stipulated that a factual basis existed for each charged offense and requested that [the defendant] be allowed to enter her guilty

pleas in reverse chronological order, with sentencing to follow in the same manner. 77 Hawai'i at 394, 885 P.2d at 1135. Over the prosecution's objection, the district court accepted the defendant's pleas as proffered and therefore did not apply the repeat offender provisions of HRS § 712–1200(4) (Supp.1992) to the defendant's sentence. *Id.* at 394–95, 885 P.2d at 1135–36. At that time, HRS § 712–1200(4) provided in relevant part:

> Notwithstanding any other law to the contrary, a person convicted of committing the offense of prostitution shall be sentenced as follows:
>
> (a) *For the first offense*, a fine of $500 and the person may be sentenced to a term of imprisonment of not more than thirty days....
>
> (b) *For any subsequent offense*, a fine of $500 and a term of imprisonment of thirty days, without possibility of suspension of sentence or probation.

*Id.* at 395, 885 P.2d at 1136 (emphases added).

On appeal by the prosecution, this court construed the term "subsequent offense" as follows:

> The word "subsequent" is defined as "[f]ollowing in time; coming or being later than something else; succeeding." *Black's Law Dictionary* 1427 (6th ed.1990). Thus, in the context of HRS § 712–1200(4)(b), any offense occurring *after* the date of the first offense is a "subsequent offense." According to this plain interpretation, all of [the defendant's] offenses occurring after the date of the first offense are subsequent offenses subject to the mandatory sentence prescribed in subsection (b). Any other reading of HRS § 712–1200(4) would produce an absurd result, *Franks*, 74 Haw. at 341, 843 P.2d at 674, and contradict the obvious meaning of the statute. *State v. Paaluhi*, 70 Haw. 237, 240, 768 P.2d 235, 237 (1989).

*Id.* at 395–96, 885 P.2d at 1135–36 (emphasis in original). Because we were satisfied that an absurd result could only be avoided by employing the "plain meaning" approach to the construction of the term "subsequent of-

fense," we noted in *Ramela* that resort to the legislative history was "not necessary to our analysis," although we observed, in a footnote, that the legislative history supported our construction. *Id.* at 396 n. 3, 885 P.2d at 1136 n. 3. *See also State v. Simpson,* 9 Haw.App. 165, 827 P.2d 1156 (1992) (holding that a second offense was "subsequent," for purposes of HRS § 712–1200(4), inasmuch as it was " 'subsequent,' in terms of both commission and ascertainment of guilt," notwithstanding that the two convictions had occurred simultaneously in the course of the same proceeding).

Likewise, because the plain meaning of the term "offense," as employed in HRS § 709–906(5)(b), does not lead to an absurd or unjust result, this court is constrained to abide by that meaning in construing the statute in the present case.

■ In noting that an offense is committed at the time its elements occur, however, we do not mean to imply that a prior offense may be *proved,* for purposes of enhancing the sentence of a "second" or "subsequent" offense, in a manner other than through evidence of a conviction of the prior offense. In the matter before us, the issue is not directly implicated, inasmuch as the two offenses relevant to our analysis were adjudicated simultaneously in the same court by way of no contest pleas, thereby obviating the need for actual proof of the initial offense. *See State v. Merino,* 81 Hawai'i 198, 215–19, 915 P.2d 672, 689–93 (1996). In any event, we agree with Dudoit and the Colorado Supreme Court that "it is not known legally that an offense has been committed until there is a conviction." *Nees,* 615 P.2d at 693. Accordingly, in order to prove a prior offense in order to justify an enhanced sentence for a

"second" or "subsequent" offense pursuant to HRS § 709–906(5), the prosecution must adduce evidence of a *conviction* of the prior offense.[10]

B. *The Repeat Offender Provision Of HRS § 709–906(5)(b) May Be Applied To "Offenses" "Occurring" On The Same Day.*

■ Dudoit next argues, by analogy to *Ramela,* that "offenses must occur on separate dates to constitute separate offenses" for purposes of HRS § 709–906(5)(b). Dudoit focuses on the *Ramela* court's use of the phrase "any offense occurring *after the date* of the first offense." *Id.* at 395, 885 P.2d at 1135 (emphasis added).

Neither HRS §§ 712–1200(4) nor 709–906(5) makes any express mention of the "date" of a "second" or "subsequent" offense for purposes of the application of the relevant repeat offender provision. Moreover, neither statute provides any indication that the legislature intended to require "subsequent" offenses to occur on different days.

■ In *Ramela,* it was not analytically necessary to address the question whether a second offense occurring on the same day as the first constitutes a "subsequent" offense. The offenses that "follow[ed] in time" in that case were committed after the date of the first offense.[11] Thus, our use of the phrase "after the date" in *Ramela,* somewhat inartful as it may have been, merely reiterated what we had already held in the preceding sentence—that a "subsequent" offense is one "coming or being later than" a prior offense. To the extent that our language in *Ramela* implied anything beyond that straightforward proposition, we hereby clarify that HRS § 712–1200(4) does *not* require that a

10. The conviction constitutes the adjudicated proof that the prior offense, in fact, occurred. As discussed *supra,* however, the date of the prior offense is the date on which the elements of the prior offense occurred and not the date of conviction. To use the present case as an example, Dudoit was *convicted* in connection with his attack on Josette on February 9, 1998, when the family court's judgment was filed. However, the *offense* occurred on September 14, 1997, when Dudoit actually attacked Josette.

11. Although two of the offenses at issue in *Ramela* were committed on the same evening, it is clear that they were not the defendant's first and second offenses, inasmuch as we expressly vacated "the sentences for *each* of Ramela's six offenses." *Ramela,* 77 Hawai'i at 396, 885 P.2d at 1137. Had the first two offenses occurred on the same day, and had we meant to impose a rule that offenses occurring on the same day cannot be considered "subsequent" for purposes of the repeat offender provision of HRS § 712–1200(4), we would have vacated only four of the defendant's sentences.

"subsequent" offense occur on a separate day.

Likewise, inasmuch as the language of HRS § 709–906(5) provides no indication that a "second" or "subsequent" offense cannot occur on the same day as the "first offense," we reject Dudoit's invitation to impose such an arbitrary rule.

C. *The Brief Interval Separating The "Offenses" In The Present Case Does Not Preclude The Application Of HRS § 709–906(5)(b).*

As a final matter, Dudoit argues, by analogy to *Ramela* and *Tavares*, that multiple violations of HRS § 709–906 committed as part of the same incident do not constitute "second" or "subsequent" offenses for purposes of HRS § 709–906(5)(b). Like the term "offense," the adjectives "second" and "subsequent," which modify that term in HRS § 709–906(5)(b), are plain and unambiguous. *See supra* section III.A; *Ramela*, 77 Hawai'i at 395, 885 P.2d at 1136. Dudoit argues, however, that the simultaneity of his commission of the two charged offenses would render absurd and unjust the application of the repeat offender provision to him.

■ Both Dudoit and the dissent place an unwarranted spin on the prosecution's offer of proof by arguing that Dudoit's attacks on Josette and Michelle "took place virtually simultaneously." Dissenting opinion at 279, 978 P.2d at 717. In fact, the prosecution represented that, after Dudoit inflicted several blows upon Josette and Michelle, Josette "intervened, stopped [Dudoit and Michelle] from fighting, was able to get [Michelle,] and they ran over to their neighbor's house[.]" Dudoit rekindled the confrontation "[a] short time later," when he went to the neighbor's home and "got into *another* fight with ... both victim[s]." (Emphasis added.) Apparently encountering Michelle outside of the neighbor's house, Dudoit again kicked her and grabbed her hair while "[Josette] was in the house." Josette then came outside and

spat on the defendant, provoking him to "grab[ ] her hair and ... slap[ ] her on the head[.]" Although the record does not reflect the particular blows upon which the family court relied in accepting Dudoit's no contest pleas,[12] the family court could thus have legitimately selected blows that were separated by a significant interval. Accordingly, Dudoit's offenses could hardly be deemed "simultaneous." That being the case, we hold that the offense charged in Count II was "subsequent" to the offense charged in Count I, within the plain meaning of HRS § 709–906(5)(b).

■ Lastly, Dudoit argues, pursuant to *Tavares*, that he did not have time to "reform himself" between the commission of the two offenses and that application of HRS § 709–906(5)(b) to him would therefore be unjust. However, as discussed *supra* in section III.A, the legislature could rationally have determined that multiple offenders should be more severely punished for their successive violations regardless of whether they have had the "benefit" of an intervening conviction to nudge their consciences.

We hold that the family court did not abuse its discretion in applying the repeat offender provision of HRS § 709–906(5)(b) to Count II of the complaint.

## IV. CONCLUSION

Based on the foregoing analysis, we affirm the family court's judgment, guilty conviction, and sentence.

### Dissenting Opinion by RAMIL, J.

I dissent. In my view, the majority today has adopted the *doctrine of the dissenting opinion* in *State v. Buch*, 83 Hawai'i 308, 325–26, 926 P.2d 599, 616–17 (1996) (Levinson, J., concurring and dissenting) (noting that "[e]ven where the Court is convinced in its own mind that the Legislature really meant and intended something not expressed by the phraseology of the Act, it has no authority to

---

12. We note that this court's opinion in *State v. Arceo*, 84 Hawai'i 1, 928 P.2d 843 (1996), is not implicated here, inasmuch as no jury was involved and Dudoit acquiesced in all of the prosecution's representations regarding the events material to his offenses. Moreover, Hawai'i Rules of Penal Procedure (HRPP) Rule 11(f) (1996) does not *require* that a no contest plea be supported by a "factual basis." *Merino*, 81 Hawai'i at 215–19, 915 P.2d at 689–93.

depart from the plain meaning of the language used") (citing *State v. Meyer*, 61 Haw. 74, 77–78, 595 P.2d 288, 291 (1979)). Despite any rule of statutory construction, I believe that our *foremost* obligation in construing a statute is to ascertain and give effect to the intent of the legislature. With respect to this case, I disagree that the language of HRS § 709–906(5) is so plain and unambiguous as to justify a departure from the clear legislative intent to have the repeat offender provision apply to cases where there is a prior abuse conviction.

## I. *Our Foremost Obligation In Statutory Construction*

Absent constitutional obstacles, we have long recognized that our foremost obligation in construing a statute is to ascertain and give effect to the intention of the legislature to the fullest degree. *See CARL Corp. v. State, Dept. of Educ.*, 85 Hawai'i 431, 459, 946 P.2d 1, 29 (1997); *see also Kim v. Contractors License Bd.*, 88 Hawai'i 264, 269, 965 P.2d 806, 811 (1998) (quoting *Korean Buddhist Dae Won Sa Temple of Hawaii*, 87 Hawai'i 217, 229–30, 953 P.2d 1315, 1327–28 (1998) (quoting *State v. Cullen*, 86 Hawai'i 1, 8–9, 946 P.2d 955, 963–64 (1997))); *Kawamata Farms, Inc. v. United Agri Products*, 86 Hawai'i 214, 255, 948 P.2d 1055, 1096 (1997) (quoting *State v. Wells*, 78 Hawai'i 373, 376, 894 P.2d 70, 73, *reconsideration denied*, 78 Hawai'i 474, 896 P.2d 930 (1995)); *Macabio v. TIG Ins. Co.*, 87 Hawai'i 307, 311, 955 P.2d 100, 104 (1998) (citing *State v. Aluli*, 78 Hawai'i 317, 320, 893 P.2d 168, 171 (1995)); *Richardson v. City and County of Honolulu*, 76 Hawai'i 46, 68–69, 868 P.2d 1193, 1215–16 (Klein, J., dissenting), *reconsideration denied*, 76 Hawai'i 247, 871 P.2d 795 (1994) (citing *Methven–Abreu v. Hawaiian Ins. & Guar. Co., Ltd.*, 73 Haw. 385, 392, 834 P.2d 279, 284, *reconsideration denied*, 73 Haw. 625, 838 P.2d 860 (1992) (citation omitted)). Indeed, although the established rules of statutory construction may be of aid in ascertaining and implementing legislative intent, they may not be used to deflect legislative purpose and design. *State v. Murray*, 63 Haw. 12, 18, 621 P.2d 334, 339 (1980) (citing *State v. Smith*, 59 Haw. 456, 461–62, 583 P.2d 337, 341–42 (1978) and *State v. Prevo*, 44 Haw. 665, 668–69, 361 P.2d 1044, 1047 (1961)). As this court has aptly stated in the past:

> In construing a statute the paramount guide is the intent of the legislature. While the established rules of construction, including that of *ejusdem generis*, are aids in ascertaining and giving effect to the legislative intent, these rules cannot be used in contravention of the purpose of the legislature by confining the operation of the statute within narrower limits than intended. They are neither final nor conclusive but must yield to the legislative will.

*Prevo*, 44 Haw. at 668–69, 361 P.2d at 1047 (citing 50 Am.Jur., *Statutes*, § 224, p. 203). Therefore, notwithstanding the rules of statutory construction, our paramount objective in construing a statute is to ascertain and give effect to the intent of the legislature.

Although it is true that we obtain the intent of the legislature primarily from the language of the statute itself, we have rejected an approach to statutory construction which limits our inquiry to the bare words of a statute. *Four Star Ins. Agency, Inc. v. Hawaiian Elec. Indus., Inc.*, 89 Hawai'i 427, 431, 974 P.2d 1017, 1021 (1999) (quoting *Bragg v. State Farm Mut. Auto. Ins. Co.*, 81 Hawai'i 302, 306, 916 P.2d 1203, 1207 (1996)) (quoting *Sato v. Tawata*, 79 Hawai'i 14, 17, 897 P.2d 941, 944 (1995)). Instead, we must consider the words of a statute in the context of the entire statute and construe it in a manner consistent with its purpose. *See Shipley v. Ala Moana Hotel*, 83 Hawai'i 361, 364–65, 926 P.2d 1284, 1287–88 (1996) (quoting *State v. Toyomura*, 80 Hawai'i 8, 19, 904 P.2d 893, 904 (1995)); *see also Mendes v. Hawaii Ins. Guar. Ass'n*, 87 Hawai'i 14, 17, 950 P.2d 1214, 1217 (1998) (citing *Mathewson v. Aloha Airlines, Inc.*, 82 Hawai'i 57, 71, 919 P.2d 969, 983 (1996)).

In considering the meaning of the words in a statute, "[t]he legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction[,] and illogicality." *Kim*, 88 Hawai'i at 270, 965 P.2d at 812 (quoting *State v. Arceo*, 84 Hawai'i 1, 19, 928 P.2d 843, 861 (1996) (citation and internal

quotation marks omitted)); *see also* HRS § 1–15(3) (1993) (providing that "[e]very construction which leads to an absurdity shall be rejected"). To determine whether an interpretation of a statute will yield an absurd result, we may consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it . . . to discover its true meaning." HRS § 1–15(2) (1993). Further, "[l]aws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." *State v. Ake*, 88 Hawai'i 389, 395, 967 P.2d 221, 227 (1998) (quoting HRS § 1–16 (1993)). Indeed,

> when aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no rule of law which forbids its use, however clear the words may appear on superficial examination. *Thus, the plain language rule of statutory construction, does not preclude an examination of sources other than the language of the statute itself even when the language appears clear upon perfunctory review.* Were this not the case, a court may be unable to adequately discern the underlying policy which the legislature seeks to promulgate and, thus, would be unable to determine if a literal construction would produce an absurd or unjust result, inconsistent with the policies of the statute.

*Four Star*, 89 Hawai'i at 431, 974 P.2d at 1021. (quoting *Bragg*, 81 Hawai'i at 306, 916 P.2d at 1207 (quoting *Sato*, 79 Hawai'i at 17, 897 P.2d at 944)) (emphasis added); *see also Kahana Sunset Owners Ass'n v. Maui County Council*, 86 Hawai'i 132, 134, 948 P.2d 122, 124 (1997) (quoting *Crompton v. Tern Corp.*, 83 Hawai'i 1, 6, 924 P.2d 169, 175 (1996) (citation omitted)).

In light of our foremost obligation to ascertain and give effect to the intent of the legislature, I disagree with the majority's use of the bare words of HRS § 709–906 to contravene the clear intent of the legislature.

## II. *DISCUSSION*

### A. *The Intent of the Legislature in HRS § 709–906*

As the majority concedes, in enacting HRS § 709–906, the legislature had intended for the repeat offender provision of HRS § 709–906 to be consistent with the repeat offender provisions of HRS §§ 580–10, 586–4, and 586–11. Majority at 267–269, 978 P.2d at 704–706. In this regard, the legislature intended that the repeat offender provision of HRS § 709–906 to apply to *convictions* occurring after a first *conviction*. Having accurately ascertained the intent of the legislature, our foremost obligation requires us to give effect to the intent of the legislature by construing the repeat offender provision of HRS § 709–906 to apply to abuse *convictions* occurring after the first abuse *conviction.*

Indeed, as the majority notes, subsection (5) of HRS § 709–906 was added to the statute in 1992 by Act 290. Majority at 267–268, 978 P.2d at 704–705. In addition to amending HRS § 709–906, Act 290 amended three other repeat offender provisions similar to that added to HRS § 709–906. Each of the three other "repeat offender" provisions created by Act 290 expressly refers to *convictions* with respect to the imposition of additional or enhanced sentencing.

In amending HRS § 709–906 in 1992, the House Judiciary Committee reported that the purpose of the amendment was to make

> any person *convicted* of a second offense or any subsequent offense or any subsequent offense which occurs within one year of the previous offense to be termed a "repeat offender" for the purposes of sentencing and . . . serve a minimum jail sentence of thirty days.

Hse. Stand. Comm. Rep. No. 20–92, in 1992 House Journal, at 906 (emphasis added). As the majority notes, House Bill 3326, which related to HRS § 709–906, was consolidated with several other bills relating to HRS §§ 580–10, 586–4, and 586–11. Majority at 268–269, 978 P.2d 705–706. The Senate Judiciary Committee described the purpose of consolidating the bills as follows:

> Your Committee . . . found this bill to be an appropriate vehicle to consolidate several bills amending the provisions of chapter 586, a bill dealing with chapter 709 and a proposed amendment to chapter 580.

*These bills were thematically related and consolidation provided a better prospect of consistency.* More specifically[,] the following bills were incorporated: H.B. 2605, H.D. 1 (§ 586–4 and –11), H.B. 3221, H.D. 1 (§ 585–5 and –6) and H.B. 3326, H.D. 1 (§ 709–906). In addition, a proposed amendment to section 580–1, Hawai'i Revised Statutes was included.

. . . .

H.B. No. 3326, H.D. 1 proposed mandatory jail time, similar to the provision of H.B. No. 2605, H.D. 1 for abuse of a household member or refusal to comply with a lawful order of a police officer who is interceding in a domestic dispute concerning the provisions taken from H.B. 2605, H.D. 1. *Your Committee notes that this consistency is achieved at the cost of reducing the currently applicable penalties. Consistency was chosen, over maintaining the more stringent penalties in the current law* [.]

Sen. Stand. Comm. Rep. No. 2651, in 1992 Senate Journal, at 1181 (emphases added). The conference committee made further reference to the goal of "consistency":

This bill is used as a vehicle to consolidate several bills amending the provisions of Chapter 586, HRS, a bill dealing with Chapter 709, HRS, and a proposed amendment to Chapter 580, HRS. *These bills are thematically related and consolidation provides a better prospect of consistency.*

Conf. Comm. Rep. No. 122, in 1992 House Journal, at 854 (emphasis added). Given the legislative history behind the enactment of HRS § 709–906, it is unmistakable that the legislature intended for the repeat offender amendments to HRS §§ 580–10, 586–4, 586–11, and 709–906 to "have the same effect." Majority at 269, 978 P.2d at 706. Therefore, as the majority acknowledges, the legislature intended that the repeat offender amendments to HRS § 709–906 apply to convictions occurring after a first conviction. Majority at 267–269, 978 P.2d at 704–706.

Based upon the majority's accurate recitation of the legislature's intent, it is puzzling how the majority can ignore the legislature's intent to apply the repeat offender provision of HRS § 709–906 in this case where Dudoit did not have a prior abuse conviction. Because our foremost obligation is to give effect to the intent of the legislature, I would limit the application of the repeat offender provision of HRS § 709–906 to cases where there is a prior abuse conviction.

### B. *The Language of HRS § 709–906*

We have previously stated that the words of a statute are only a starting point in the construction of a statute. *Shipley,* 83 Hawai'i at 364–65, 926 P.2d at 1287–88. Yet, the majority effectively concludes that the term "offense," as used in HRS § 709–906, is so plain and unambiguous that it justifies a departure from the legislature's clear intent. With this proposition, I cannot agree.

In arriving at its definition of "offense," the majority cites to Black's Law Dictionary 1081 (6th ed.1990). Majority at 269–270, 978 P.2d at 706–707. In my view, however, the dictionary definition of "offense" is only a starting point in ascertaining its meaning. *See Shipley,* 83 Hawai'i at 364–65, 926 P.2d at 1287–88 (noting that the dictionary definition of "constantly necessary" is only a starting point). As the majority observes, Black's Law Dictionary defines an "offense" as "a *breach* of the criminal laws," *i.e.,* a *"violation* of law for which [a] penalty is prescribed." Majority at 269, 978 P.2d at 706 (emphases added). In contrast, the term "conviction" is "[t]he final judgment on a verdict or finding of guilty, a plea of guilty, or a plea of nolo contendere[.]" *Id.* at 269, 978 P.2d at 706.

However, these dictionary definitions are not conclusive for purposes of enhancing a defendant's sentence under the repeat offender provision of HRS § 709–906. Although the terms "offense" and "conviction" have different dictionary meanings, they are not mutually exclusive. As the majority observes, "one may be 'convicted' of a 'crime,' which is a type of 'offense.'" Majority at 270, 978 P.2d at 707. Because a conviction is merely a type of offense, it is unclear whether the term "offense," for purposes of enhancing a defendant's sentence under the repeat offender provision, means: (1) an "of-

fense" that a defendant has been convicted of, *i.e.*, adjudication of guilt; or (2) an "offense" that has simply "occurred," *i.e.* the moment at which the "elements ... [of the crime] have actually taken place."[1] *Id.* Given the statute's ambiguity as to which type of "offense" would subject a defendant to a mandatory jail term, I am not convinced that the term "offense" is so plain and unambiguous as to justify the departure from the clear legislative intent to have the repeat offender provision of HRS § 709–906 apply to cases involving convictions occurring after a first conviction.

## C. *Application of the HRS § 709–906*

The majority's disregard of the clear legislative intent to have the repeat offender provision of HRS § 709–906 to apply to cases involving convictions occurring after a first conviction leads to an absurd result in this case. A review of the record indicates that the events forming the bases of the separate offenses in this case occurred on the same day during the same incident. According to the factual basis presented by the prosecution, in the course of an argument between Dudoit and his wife, Dudoit kicked his wife (Josette) in the arm and kicked the refrigerator door causing it to hit Josette's arm. Immediately thereafter, as Josette's daughter (Michelle) went to stop Dudoit, Dudoit pulled Michelle's hair and punched her in the head. These events took place virtually simultaneously.

Thereafter, the prosecution charged Dudoit with one count of abuse of a family and household member for his actions against Josette (Count I). In the same complaint but in a separate count, the prosecution charged Dudoit with abuse of a family and household member for his actions against Michelle (Count II). Dudoit pleaded no-contest to both counts. At sentencing, the family court ruled that Count II of the complaint was a "second offense" under the repeat offender provision of HRS § 709–906 and on that basis, imposed the enhanced minimum jail term.

By upholding the enhanced sentence in this case, the majority allows a defendant who committed essentially a single offense in a single incident to be classified a "repeat offender." In other words, the majority allows a defendant convicted on two counts under the same indictment or complaint to be classified as a "repeat offender" and subject to an enhanced mandatory minimum term of incarceration. In light of the legislative intent to apply the repeat offender provision of HRS §§ 580–10, 586–4, 586–11, and 709–906 consistently to a second or subsequent conviction, I presume that the legislature could not have intended the absurd result of subjecting a defendant to an enhanced term of incarceration simply by virtue of having been convicted on multiple counts in the same indictment or complaint (*i.e.*, in a single incident). *See Kim*, 88 Hawai'i at 270, 965 P.2d at 812 (noting that because legislature is presumed not to intend an absurd result, we will construe a statute to avoid inconsistency, contradiction, and illogicality).

Moreover, the majority fails to acknowledge that in considering whether to impose the enhanced sentencing provision of HRS § 709–906, the family court must necessarily consider a defendant's prior abuse convictions, as opposed to a defendant's prior charged "offenses." Indeed, without a prior conviction, it is absurd to impose an enhanced jail term under the repeat offender provision of HRS § 709–906. Otherwise, a defendant may be sentenced under the repeat offender provision on the basis of a prior charge for which the defendant was not convicted. In other words, given the effect of the majority's position that a conviction is irrelevant for purposes of sentencing a defendant under the repeat offender provision, the majority's definition of the term "offense" could very well include a situation where a defendant was previously charged but not convicted of an abuse charge.

Although an "offense" occurs when "the elements of the offense have actually taken

---

1. "Offense" could also mean a charge or an indictment for an offense that has occurred, *i.e.*, the elements of the crime have taken place. In any event, it is unclear, based on the bare words of the statute, what kind of "offense" would subject a defendant to the repeat offender provision of HRS § 709–906.

place," it is undisputable that "it is not known legally that an offense has been committed until there is a conviction." *People v. Nees*, 200 Colo. 392, 615 P.2d 690 (1980). In this regard, the sentencing court cannot legally know whether a person has committed a "breach" or "violation" of our penal code until there is an adjudication of that fact.

Therefore, I cannot agree with the majority's construction of the term "offense" in a vacuum. Instead, in deciding whether to impose the enhanced jail term under the repeat offender provision of HRS § 709–906, the family court must necessarily consider a defendant's prior abuse convictions, as opposed to prior "offenses." Because the majority's strict construction of the bare words of HRS § 709–906 leads to an absurd result, I disagree with the majority's conclusion that this court has no authority to depart from the plain meaning of the language used in HRS § 709–906.

## III. *CONCLUSION*

Accordingly, because the majority's construction of HRS § 709–906(5) ignores our foremost obligation to give effect to the intent of the legislature, I respectfully dissent.